ACCEPTED
01-15-00230-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/8/2015 3:46:53 PM
CHRISTOPHER PRINE
CLERK

**No. 01-15-00230-CV**

# In The Court Of Appeals
# For The First District of Texas
# Houston, Texas

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/8/2015 3:46:53 PM
CHRISTOPHER A. PRINE
Clerk

**GEORGE DAVIS, MD, ANTENEH ROBA, MD, LEVON VARTANIAN, MD, WOODROW DOLINO, MD, NORTHWEST HOUSTON EMERGENCY SPECIALIST GROUP, PLLC, ESG MD, PLLC AND ESG MLP, LLC,**
*Appellants*

**V.**

**ALAN BENTZ, MD,**
*Appellee*

FROM THE 190TH JUDICIAL DISTRICT COURT, HARRIS COUNTY, TEXAS
CAUSE NO. 2012-44569
HONORABLE JUDGE KERRIGAN, PRESIDING

**APPELLEE'S BRIEF**

**NORTON ROSE FULBRIGHT US LLP**

Andrew Price
State Bar No. 24002791
andrew.price@nortonrosefulbright.com
Rachel Roosth
State Bar No. 24074322
rachel.roosth@nortonrosefulbright.com
James Hartle
State Bar No. 24082164
jim.hartle@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Telecopier: (713) 651-5246
*Counsel for Appellee Alan Bentz, M.D.*

## CORRECTION REGARDING IDENTITY OF COUNSEL

Appellant's Joint Brief provided the former name of the law firm representing Appellee: Fulbright & Jaworski, LLP. Its current and correct name is Norton Rose Fulbright US LLP.

The proper information of counsel for **Appellee Alan Bentz, M.D.** is as follows:

Andrew Price
andrew.price@nortonrosefulbright.com
Rachel Roosth
rachel.roosth@nortonrosefulbright.com
James Hartle
jim.hartle@nortonrosefulbright.com
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Tel: (713) 651-5151
Fax: (713) 651-5246

# TABLE OF CONTENTS

CORRECTION REGARDING IDENTITY OF COUNSEL ................................. II

TABLE OF CONTENTS .......................................................................... V

STATEMENT OF THE CASE ............................................................... VIII

STATEMENT REGARDING ORAL ARGUMENT ........................................ X

STATEMENT OF ISSUES PRESENTED .................................................. XI

STATEMENT OF FACTS ........................................................................ 1

SUMMARY OF THE ARGUMENT ............................................................ 8

    I.     Standard of Review ............................................................... 13

    II.    Applying Texas law: the Award must be upheld ...................... 14

        A.    Without a complete record of the arbitration proceedings, Appellants cannot overcome the presumption in favor of upholding the Award ............................................................. 15

            1.    The issues decided by the Arbitrator were submitted in the arbitration, and without a complete record, the trial court had to presume that they were submitted ........................................ 18

            2.    The evidence supported the damages awarded, and without a complete record, the trial court had to presume that it did ........................................ 19

            3.    Appellants conceded the value of Dr. Bentz's membership interest, and without a complete record, the trial court could not find otherwise ............. 22

        B.    The Arbitrator properly exercised his broad authority under Section 9.02 to decide all disputes other than those decided under Section 9.01 ...................................... 24

            1.    Section 9.02 gave the Arbitrator authority to decide all disputes related to the Company Agreement other than disputes resolved pursuant to Section 9.01, and none of the disputes the Arbitrator decided were, or could have been, decided under Section 9.01 ........................................... 26

2.    The Arbitrator had authority to decide the appropriate remedies for the disputes submitted to him under Section 9.02 ..................................................28

    a.    There was no requirement that the parties agree to the remedies selected by the Arbitrator ..........................................................29

    b.    Dr. Bentz did seek to recover the Fair Market Value of his interest, but regardless, this was an issue for the Arbitrator to decide ......32

3.    The Award was rationally inferable from the Agreement, as shown by the Arbitrator's well-reasoned discussion in the Award ................................33

    a.    The essence test does not allow the non-prevailing party to retry the dispute ...................34

    b.    The Arbitrator correctly determined that Dr. Bentz was still a member after expulsion .....35

C.    The Arbitrator did not award a double recovery, but even if he had, it would not be grounds for vacatur ..........................39

1.    Double recoveries do not warrant vacatur .....................39

    a.    Prohibiting double recoveries is not so fundamental a policy that it would outweigh public policy in favor of upholding arbitration awards ..............................................40

    b.    Violating public policy is not a ground for vacatur under the Federal Arbitration Act ..........43

2.    The Award compensates Dr. Bentz for separate injuries and therefore does not grant a double recovery ....................................................................45

D.    Even if the Court were to vacate the Award, it could not order the modification that Appellants request ........................47

CONCLUSION ............................................................................................49

CERTIFICATE OF SERVICE .........................................................................51

CERTIFICATE OF COMPLIANCE ..................................................................52

**APPENDIX**

1. The Company Agreement (C.R. 112–36)

2. The Award (signed October 15, 2014) (C.R. 1488–92)

3. The Judgment (signed December 9, 2014) (C.R. 1794–95)

4. Order Confirming an Arbitration Award (signed December 9, 2014) (C.R. 1796)

5. Order Denying Application for Partial Vacatur or Modification of Arbitration Award (signed December 9, 2014) (C.R. 1797)

6. Order Denying Individually Named Respondents' Motion to Partially Vacate or Vacate Arbitration Award or in the Alternative, Motion to Modify Award (signed December 9, 2014) (C.R. 1798).

7. TEX. BUS. ORGS. CODE § 101.106 (West 2015)

8. TEX. CIV. PRAC. & REM. CODE § 171.087 (West 2015)

9. TEX. CIV. PRAC. & REM. CODE § 171.090 (West 2015)

10. 9 U.S.C. § 9 (West 2015)

11. Excerpts from Dr. Bentz's Prehearing Brief

# INDEX OF AUTHORITIES

**CASES:**

*Ancor Holdings, L.L.C. v. Peterson, Goldman & Villani, Inc.*,
        294 S.W.3d 818 (Tex. App.—Dallas 2009, no pet.)………..……..…….34–35

*Anzilotti v. Gene D. Liggin, Inc.*,
        899 S.W.2d 264 (Tex. App.—Houston [14th Dist.] 1995, no writ)……13–15

*Barton v. Fashion Glass and Mirror, Ltd.*, 321 S.W.3d 641
        (Tex. App.—Houston [14th Dist.] 2010, no pet.)…………………..…..24

*Black v. Shor*, 443 S.W.3d 154
        (Tex. App.—Corpus Christi 2013, pet. denied).................……………41, 43

*Brockman v. Tyson*, No. 01-03-01335-CV, 2005 WL 2850128
        (Tex. App.—Houston [1st Dist.] Oct. 27, 2005, pet. denied)..………18–19, 33

*Burlington Resources Oil & Gas Co., LP v. San Juan Basin Royalty Trust*,
        249 S.W.3d 34 (Tex. App.—Houston [14th Dist.] 2007, pet. denied)....30–31

*CC Williams Construction Co., Inc. v. Rico*, No. 09-10-00472-CV,
        2011 WL 2135074 (Tex. App.—Beaumont May 19, 2011, no pet.)..…20–22

*Centex/Vestal v. Friendship West Baptist Church*, 314 S.W.3d 677
        (Tex. App.—Dallas 2010, pet. denied)……...................…..……..17–18, 24

*City of Waco v. Kelly*, 309 S.W.3d 536 (Tex. 2010)……………………….…..48

*CVN Group, Inc. v. Delgado*, 95 S.W.3d 234 (Tex. 2002)………………40–42, 44

*Executone Info Sys., Inc. v. Davis*, 26 F.3d 1314 (5th Cir. 1994)…………….33–34

*Forest Oil Corp. v. El Rucio Land and Cattle Co., Inc.*, 446 S.W.3d 58
        (Tex. App.—Houston [1st Dist.] July 24, 2014, pet. filed)………………..24

*Fortune v. Killebrew*, 23 S.W. 172 (Tex. 1893)……………………………….30–31

*GJR Mgmt. Holdings, L.P. v. Jack Raus, Ltd.*, 126 S.W.3d 257
(Tex. App.—San Antonio 2003, pet. denied)…………………….…13, 17

*Goldman v. Buchanan*, No. 05-12-00050-CV, 2013 WL 1281744
(Tex. App.—Dallas Mar. 21, 2013, no pet.)...........……………………16

*Goodyear Tire & Rubber Co. v. Sanford*, 540 S.W.2d 478
(Tex. Civ. App.—Houston [14th Dist.] 1976, no writ)……..…………42, 44

*Gulf Oil Corp. v. Guidry*, 327 S.W.2d 406 (Tex. 1959)…………………30–31, 48

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 522 U.S. 576 (2008)……………….43

*IQ Holdings, Inc. v. Villa D'Este Condominium Owners' Ass'n Inc.*,
__ S.W.3d. __, No. 01-11-00914-CV, 2014 WL 982844
(Tex. App.—Houston [14th Dist.]      Mar. 1, 2014, no pet.)…….......……14

*Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266 (Tex. 1992)…………………26

*Kline v. O'Quinn*, 874 S.W.2d 776 (Tex. App.—Houston
[14th Dist.] 1994, writ denied)………………..14–15, 18–19, 24, 32, 47

*Lee v. Daniels & Daniels*, 264 S.W.3d 273
(Tex. App.—San Antonio 2008, pet. denied)…..……………….……..42, 45

*Lee v. El Paso County*, 965 S.W.2d 668
(Tex. App.—El Paso 1998, pet. denied)………….....................…..42, 44–45

*Mega Builders, Inc. v. Paramount Stores, Inc.* No. 14-14-00744-CV,
2015 WL 3429060 (Tex. App.—Houston [14th Dist.]
May 28, 2015, no pet. h.)………………………………………………21–22

*Nafta Traders Inc. v. Quinn*, 339 S.W.3d 84 (Tex. 2011)……………………15–17

*Petroleum Analyzer Co. LP v. Olstowski*, No. 01-09-00076-CV,
2010 WL 2789016 (Tex. App.—Houston [1st Dist.] 2010, no pet.)………44

*Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896 (Tex. 1995)…………………24

*Rapid Settlements, Ltd. v. Symetra Life Ins. Co.*,
    234 S.W.3d 788 (Tex. App.—Tyler, no pet.)…………………..…..42–43, 45

*Roe v. Ladymon*, 318 S.W.3d 502 (Tex. App.—Dallas 2010, no pet.)…...29, 41, 43

*Royce Homes, L.P. v. Bates*, 315 S.W.3d 77
    (Tex. App.—Houston [1st Dist.] 2010, no pet.)…………….…………42–44

*Schuster v. Wild*, No. 13-13-00474-CV, 2014 WL 3804834
    (Tex. App.—Corpus Christi March 5, 2015, pet. denied)……….…….16–17

*Smith v. Gladney*, 98 S.W.2d 351, 352 (Tex. 1936)…………………….…...42, 44

*Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564
    (Tex. App.—Dallas 2008, no pet.)…………..……………………………15–17

*Turner v. Package Exp., L.P.*, No. 14-12-00241-CV, 2013 WL 2149786
    (Tex. App.—Houston [14th Dist.] May 16, 2013, no pet.)………...……….23

*Vorwerk v. Williamson County Grain*, No. 03-10-00549-CV,
    2012 WL 593481 (Tex. App.—Austin Feb. 23, 2012, pet. denied)…...……17

*Waite Hill Services, Inc. v. World Class Metal Works, Inc.*,
    959 S.W.2d 182 (Tex. 1996)……………………..…………….…………..45

*Werline v. E. Tex. Salt Water Disposal Co.*, 209 S.W.3d 888
    (Tex. App.—Texarkana 2006) *aff'd* 307 S.W.3d 267 (Tex. 2010)..………41

*Xtria L.L.C. v. Int'l Ins. Alliance, Inc.*, 286 S.W.3d 583
    (Tex. App.—Texarkana 2009, pet. denied)……………..……………13, 41

**STATUTES:**

TEX. CIV. PRAC. & REM. CODE § 171.087 (West 2015)…………...………..13

TEX. CIV. PRAC. & REM. CODE § 171.090 (West 2015)…………………..……30

9 U.S.C. § 9 (West 2015)……………………………………………………13

# STATEMENT OF THE CASE

This case involves claims brought by Appellee, Dr. Alan Bentz, against the Company (three limited liability companies Dr. Bentz co-founded) and the Individual Appellants (the Company's other founding members).[1] In late 2011, the Individual Appellants presented Dr. Bentz with a Hobson's choice: he could accept only $100,000 for the purchase of his membership interest in the Company, or he would be expelled from it. Appellants' Joint Brief at 1, n. 3. When Dr. Bentz refused this low-ball offer, the Individual Appellants made good on their threat and voted to expel him. *Id*. Under the Company Agreement,[2] however, Dr. Bentz remained a member of the Company until he sold his membership interest. C.R. 1489.[3] After the expulsion vote, the Company elected to exercise its option under the Company Agreement to purchase Dr. Bentz's membership interest, but the Company later refused to pay the purchase price, which was Fair Market Value. *Id*. The Company also began paying Dr. Bentz's share of the membership distributions to the Individual Appellants instead of Dr. Bentz. *Id*. at 1490.

---

[1] "The Company" refers to appellants Northwest Houston Emergency Specialists, P.L.L.C. ("NHESG"), ESG MD, P.L.L.C., and ESG MLP, L.L.C, collectively. "The Individual Appellants" refers to Dr. George Davis, Dr. Levon Vartanian, Dr. Anteneh Roba, and Dr. Woodrow Dolino, collectively. "Appellants," as used herein, refers to the Company and the Individual Appellants, collectively.

[2] "Company Agreement" refers to the Company Agreements of each of the Company entities, which are identical except for the name of the entity. *See* C.R. 112–136 (the Company Agreement).

[3] The Clerk's Record is cited herein as "C.R. _____."

The parties participated in a 5-day arbitration hearing in August 2014. A complete transcript of the arbitration hearing was ***not*** made. At the hearing, and through extensive pre- and post-hearing briefing, Dr. Bentz showed that the Appellants' actions constituted breaches of the Company Agreement, conversion, and breaches of fiduciary duties. C.R. 1489–90. The Arbitrator then issued an arbitration award in Dr. Bentz's favor (the "Award"). *See id*. at 1488–92. The Award granted Dr. Bentz the Fair Market Value purchase price of his membership interest, his distributions that were wrongfully paid to the Individual Appellants, pre-judgment interest, and attorneys' fees. *Id*. at 1489–91. The Arbitrator also declared that Dr. Bentz had remained a member of the Company until the date of the Award. *Id*. at 1490.

Dr. Bentz then moved the trial court to confirm the Award. C.R. 1321–1325. Unhappy with the Award, Appellants filed motions opposing confirmation in which they sought to re-litigate the merits of the arbitration. C.R. 1413–1444, 1605–1623. But the Honorable Patricia Kerrigan, Judge of the 190th Judicial District Court of Harris County, Texas, confirmed the Award, denied Appellants' motions to vacate the Award, and signed the Judgment in Dr. Bentz's favor. C.R. 1794–98. Appellants' motions for reconsideration of the confirmation were denied, and Appellants filed a notice of appeal on March 9, 2015. C.R. 1962–63. This appeal follows.

## STATEMENT REGARDING ORAL ARGUMENT

In this appeal, Appellants ask the Court to ignore Texas's strong presumption in favor of arbitration awards and set aside a just arbitration award rendered by an arbitrator who acted with full authority. Furthermore, Appellants misconstrue the Award and ask this Court to rely on an incomplete record in order to overturn it. Thus, and as shown more fully below, Appellants' asserted points of error run so contrary to Texas law that they do not merit oral argument before the Court.

## STATEMENT OF ISSUES PRESENTED

***Issue 1***:    Did the trial court err by Confirming the Award over Appellants' opposition when:

    (a)    The Arbitrator followed the Company Agreement's mandate that all disputes be arbitrated other than disputes over the narrow issues enumerated in Section 9.01?

    (b)    The Arbitrator awarded Dr. Bentz that portion of Dr. Bentz's membership distributions which the Individual Appellants took for themselves despite Dr. Bentz's continuing right to those distributions during the time period in which Dr. Bentz continued to own his membership interest?

***Issue 2***:    Did the trial court err by confirming the Award over Appellants' opposition by awarding damages to Dr. Bentz for the Company's failure to complete the contractual process to purchase Dr. Bentz's membership interest and for the Company's payment of Dr. Bentz's membership distributions to the Individual Appellants during that time that Dr. Bentz was still a member of the Company?

## STATEMENT OF FACTS

Dr. Bentz and the Individual Appellants founded the Company, and each had a 20% membership interest. C.R. 112–13, 136. The Company was composed of three limited liability companies, and (along with NHESG's wholly-owned subsidiary, Houston Northwest Emergency Specialists, PLLC), it staffed the emergency department of Houston Northwest Medical Center. Appellants' Joint Brief at 1. Over the years, Dr. Bentz served in various administrative and business capacities for the Company, which became quite successful. *See* C.R. 1564 (Company income statement showing yearly profits in the millions from 2009 to 2011).

By mid-2011, however, Dr. Bentz's relationship with the Individual Appellants had soured over clashes of personalities, and the Individual Appellants decided to oust him. Appellants' Joint Brief at 1, n. 3. The Appellants offered Dr. Bentz a Hobson's choice in late 2011: the Company would pay him a mere $100,000 to buy his membership interest, or the Individual Appellants would vote to expel Dr. Bentz from the Company. *Id*. When Dr. Bentz refused this low-ball offer, the Individual Appellants voted to expel him. *Id*.

Under the Company Agreement, however, expulsion did not cause a member to automatically lose his membership interest. C.R. 1489. Instead, expulsion merely triggered the Company's and the other members' right—but not

obligation—to force the expelled member to sell his membership interest. C.R. 1489; *see also* C.R. 114 at § 2.05 ("…during a period of 180 days following the expulsion of a Member, the Company and the other Members shall have an option (but not an obligation) to purchase all of the Membership Interest owned by such…expelled Member…."). If the Company or other members elected to exercise that option, the Company Agreement required instruments conveying the membership interest to be exchanged for the purchase price at a closing. C.R. 115 at § 2.08. The purchase price would be "Fair Market Value" as defined in the Company Agreement. *See id.* at § 2.09. There were no provisions for transferring a membership interest in the event the Company or the other members exercised their option to purchase the expelled member's membership interest then failed to close and pay the purchase price.

After the Individual Appellants voted to expel Dr. Bentz, the Company elected to exercise its option to purchase Dr. Bentz's membership interest. Appellants' Joint Brief at 1. While that process was pending, Dr. Bentz remained a member. C.R. 1489–90. During that time, however, the Company did not pay Dr. Bentz his share of membership distributions and instead paid them to the Individual Appellants. C.R. 1489. For these reasons, amongst others, Dr. Bentz filed for arbitration on November 1, 2012 under the arbitration provision of Section 9.02 of the Company Agreement, which provided a mechanism for

resolving "any Dispute under [the Company Agreement] which [was] not otherwise resolved pursuant to other procedures under Section 9.01." *See* C.R. 128–29 at § 9.02; *see also* C.R. 137–153.

Section 9.02's broad scope contrasted with the narrow scope of Section 9.01, which only provided procedures to decide limited issues. *Compare* C.R. 128–29 at § 9.02 *with* C.R. 127–28 at § 9.01. In relevant part, Section 9.01 provided a procedure to determine the "controlling opinion" on the Fair Market Value of a membership interest. C.R. 127 at § 9.01(a). Per that procedure, Dr. Bentz and the Company each appointed appraisers (the "party-appointed appraisers"). C.R. 1418, 1489. Both party-appointed appraisers then opined on the Fair Market Value of Dr. Bentz's membership interest. C.R. 1418. The party-appointed appraisers also appointed a third appraiser (the "common appraiser"), whose sole task under Section 9.01 was to determine "which opinion [was] the controlling opinion . . ." on the Fair Market Value of a membership interest. *Id*.; C.R. 127–28 at § 9.01. Aside from the selection of the controlling opinion on Fair Market Value, there were only two other issues that could be decided under Section 9.01: (1) who would serve as the party-appointed appraiser for the purchasers of a membership interest; and (2) who would serve as the common appraiser. *See* C.R. 127–28 at § 9.01. Neither of those two issues are relevant in this appeal.

While the Section 9.01 proceeding to determine the controlling opinion was pending, the Individual Appellants moved to stay the Section 9.02 arbitration, arguing that any Section 9.01 proceeding had to be completed before the arbitration could proceed under Section 9.02. C.R. 102–11. On April 4, 2013, the trial court ordered the Section 9.02 arbitration stayed until the Section 9.01 procedure was completed. C.R. 522–24.

On January 3, 2014, the common appraiser chose the opinion of the Company's appraiser, Reed Tinsley, as the controlling opinion. C.R. 1418. Mr. Tinsley's opinion was that the Fair Market Value was either $257,969 under an asset approach, or $526,796 under an income approach. C.R. 1555. With this opinion chosen as the controlling opinion, the Section 9.01 proceeding was complete.[4] No other issues in the dispute were to be decided (or indeed, could be decided) under Section 9.01. The path was clear for the Section 9.02 arbitration to continue to resolve all other disputes between the parties.

---

[4] Appellants repeatedly state throughout their brief that the Section 9.01 proceeding was completed. Appellants' Joint Brief at 11 ("The parties finished the Section 9.01 process and a 'Fair Market Value' was determined. . . ."), 18 ("The determination of the controlling opinion as to Fair Market Value by Mr. Mr. Carr concluded the Section 9.01 Fair Market Value process."), 20 ("Once the Section 9.01 process was finished, the parties moved to arbitration."), and 26 ("The Section 9.01 proceeding was concluded on January 3, 2014."). It is unclear, then, why Appellants suggest at the end of their brief that the Section 9.01 proceeding has not ended. *Id.* at 46 ("If the Award against the Company is vacated, the Section 9.01 process remains open until the parties close on the purchase option."); n.38 ("This appeal must be resolved before the parties can conclude the Section 9.01 process. . . ."). In any event, as described below in Section II.B.1, the common appraiser had, as of the time of the Section 9.02 arbitration, already decided the only issue before him under Section 9.01—that is, which party-appointed appraiser's opinion was the controlling opinion on Fair Market Value.

After the Section 9.02 arbitration process resumed, the parties engaged in extensive discovery, deposed seven individuals, and submitted over 100 pages of prehearing briefing. C.R. 1324; *see also* C.R. 1419 (discussing post-hearing briefing submitted to the Arbitrator). The hearing was then held from August 19, 2014 through August 22, 2014, and reconvened for a final day on August 29, 2014. C.R. 1488. At the hearing, the Arbitrator received the testimony of Dr. Bentz, each of the four Individual Appellants, three non-party witnesses, and three expert witnesses. C.R. 1324, 1488. The Individual Appellants elected to have a court reporter transcribe part of the opening statements and part of Dr. Bentz's testimony, but they declined to have the court reporter transcribe the rest, and no other party made any record of the hearing. *See* C.R. 1782–93 (part of the incomplete record). Appellants conceded that the Fair Market Value of Dr. Bentz's membership interest was $526,796. *See* C.R. 1489 ("All Parties have acknowledged… that the appropriate Fair Market Value of Dr. Bentz's Membership Interest is $526,796."). Following the arbitration hearing, each party submitted post-hearing briefs to supplement the Parties' already-extensive prehearing briefs. *Id.*

The Arbitrator then issued the Award on October 15, 2014. C.R. 1488. In it, the Arbitrator found that "all Parties have acknowledged. . . that the appropriate Fair Market Value of Dr. Bentz's Membership Interests [was] $526,796," a figure

consistent with the controlling opinion from the Section 9.01 proceedings. C.R. 1489, 1555. The Arbitrator determined that Dr. Bentz was entitled to recover that sum because the Company breached the Company Agreement by electing to exercise the option to purchase Dr. Bentz's interest and then failing to pay the purchase price by the contractual deadline. C.R. 1489. The Arbitrator also determined that Dr. Bentz was entitled to his pro rata share of membership distributions made while Dr. Bentz remained a member because "[c]ommon sense, logic and a careful reading of the Agreements compel that, until paid for his Interest, a Member, even an expelled Member, is entitled to his share of any distributions made by the [Company]." C.R. 1490. Finally, the Arbitrator also awarded Dr. Bentz pre-judgment interest, costs, and attorneys' fees.[5] C.R. 1491.

The trial court later confirmed the Award over Appellants' objections, entered the Judgment, and denied Appellants' motions for reconsideration. C.R. 1794–98, 1962. Shortly afterward, Appellants sued the law firm and attorney who had drafted the Company Agreement, alleging that they committed malpractice. C.R. 1942–52. Appellants further alleged that they had already satisfied the Judgment—though they had not and have not done so. *See* C.R. 1950

---

[5] Per the Company Agreement, the Arbitrator awarded attorneys' fees to Dr. Bentz because he was a substantially prevailing party. *See* C.R. 131 at § 9.03 ("In the event a proceeding under this Article 9 is commenced…the party who prevails or substantially prevails in such proceeding shall be entitled to recover . . . all costs, expenses and reasonable attorneys' fees incurred in connection with the proceeding and on appeal."); C.R. 1491 ("…Claimant substantially prevailed in his claims and is entitled to recover his costs, expenses and reasonable attorney fees.").

(characterizing the award of distributions and attorneys' fees to Dr. Bentz as "pecuniary losses" that "Plaintiffs sustained. . . ."); C.R. 1947 (stating that a sum mentioned earlier in the petition "does not include any portion of the $532,064 *paid* to Bentz to buy-out his membership share . . . .") (emphasis added).  This appeal follows.

## SUMMARY OF THE ARGUMENT

At the crux of this appeal is Appellants' refusal to recognize that, under Section 9.02 of the Company Agreement, they agreed to arbitrate "any Dispute under [the Company Agreement] which [was] not otherwise resolved pursuant to other procedures under Section 9.01," which is exactly what happened when the parties submitted their dispute to the Arbitrator. In contrast, Section 9.01 provided mechanisms for the narrow determinations of: (1) who would serve as the party-appointed appraiser for a purchase of a membership interest, (2) who would serve as the common appraiser, and (3) which party-appointed appraiser's opinion would be the controlling opinion on the Fair Market Value of a membership interest. None of these issues were decided in the Section 9.02 arbitration. Rather, after a five-day hearing and over a month of deliberation, the Arbitrator properly determined, amongst other things, that: (1) Dr. Bentz was entitled to recover damages from the Company for its failure to buy Dr. Bentz's membership interest after electing to exercise its option to do so; (2) Dr. Bentz was entitled to recover damages from the Individual Appellants for their wrongful appropriation of his pro rata share of membership distributions; and (3) Dr. Bentz was entitled to recover attorneys' fees per the Company Agreement because he substantially prevailed in the arbitration.

Appellants would have the Court believe that this dispute was actually about one thing: the propriety of Dr. Bentz's expulsion from the Company. Although the parties did dispute the propriety of Dr. Bentz's expulsion, the parties also disputed what happened to Dr. Bentz's membership interest if he had been properly expelled, and resolving this dispute required interpretation of the Company Agreement—an issue for arbitration under Section 9.02. Under the Company Agreement, a member's expulsion triggered the Company's and the other members' right—but not obligation—to buy the member's membership interest at the Fair Market Value.

Here, upon Dr. Bentz's expulsion, the Company elected to exercise their option to purchase Dr. Bentz's membership interests but then refused to complete the purchase by paying Dr. Bentz the Fair Market Value. And, even though no one had paid Dr. Bentz for his membership interest, Appellants claimed that Dr. Bentz's membership interest had disappeared and that he was no longer entitled to his share of membership distributions. On the other hand, Dr. Bentz argued that because his membership interest was his personal property, he continued to own the interest and its attendant membership distribution rights until he transferred it. *See* TEX. BUS. ORGS. CODE § 101.106 (West 2015) ("A membership interest in a limited liability company is personal property.") This is the same merits-based dispute that is at issue in this appeal.

The Arbitrator has already decided this dispute, and he agreed with Dr. Bentz's interpretation of the Company Agreement and Texas law. The Arbitrator therefore awarded Dr. Bentz the damages he was entitled to: payment for his membership interest, his unpaid share of the membership distributions, attorneys' fees, prejudgment interest, and costs.

Because Appellants do not like the Arbitrator's decision, they now wish to retry the merits of the dispute. Knowing that courts defer to arbitrators to determine the merits, however, Appellants have recast their claims in the form of jurisdictional arguments. Appellants claim first that the Arbitrator exceeded his authority because the parties did not agree to grant the Arbitrator the authority to award Dr. Bentz the recoveries contained in the Award. This argument, however, ignores the fact that, by assenting to the Company Agreement, the Appellants agreed to resolve these disputes under the broad ambit of Section 9.02, and the trial court properly rejected it.

Appellants also claim that the Award includes a double recovery and that Texas's common law policy against double recoveries is so extraordinary and fundamental that its violation requires vacatur here. Appellants' argument fails because, as two other courts of appeals have held, the award of a double recovery does not warrant vacatur. Appellants' argument also fails because common law grounds for vacatur—such as vacating an arbitration award because it violates

public policy—are not grounds for vacatur under the Federal Arbitration Act, which applies here. In any event, the Award does *not* include a double recovery because its different components compensate Dr. Bentz for different injuries.

Finally, Appellants request to modify the Award so that the Award would: (1) maintain the only aspect of the Award favorable to Appellants (the Arbitrator's determination that Dr. Bentz was expelled using the proper procedures); (2) include a determination the Arbitrator never made (that Appellants did not breach the Company Agreement); and (3) delete the other components of the Award (which were unfavorable to Appellants). These requested modifications are impermissible because Appellants did not preserve this argument for appeal, they would give Appellants relief they did not request, and they would improperly segregate intertwined issues.

The Arbitrator properly interpreted Texas law and the Company Agreement, and he acted within his authority in doing so. The trial court accordingly showed due deference to the Arbitrator's well-reasoned decision. This Court should not disturb the trial court's decision, because doing so would not only upset Texas's strong presumption in favor of arbitration awards; it would undo a just Award rendered with full authority. It has been nearly four years since the Individual Appellants voted to expel Dr. Bentz, and Dr. Bentz has yet to receive any

compensation for the harm Appellants inflicted upon him. The Court should reject

Appellants' latest stalling tactic[6] and affirm the Judgment.

---

[6] There is a real risk that Appellants' stalling tactics may prevent Dr. Bentz from obtaining satisfaction of the Award and Judgment. *See* C.R. 1608 ("The Hospital Contract was the [Company's] sole source of revenue, and the [Company] held little in the way of additional assets. On October 31, 2013, during the pendency of the underlying arbitration proceedings, the Hospital Contract terminated when the Hospital elected not to renew it. The [Company] has earned no additional revenues since that time (though trailing collections continued to trickle in over the next several months). Other than these proceedings, the [Company] has no ongoing business and intends to wind down once they reach a final conclusion.")

## ARGUMENT AND AUTHORITIES

### I. Standard of Review

Appellants urge the Court to undertake a sweeping review of the Arbitrator's reasoning and set aside portions of the Award despite the fact that review of an arbitration award is "extraordinarily narrow." *GJR Mgmt. Holdings, L.P. v. Jack Raus, Ltd.*, 126 S.W.3d 257, 262 (Tex. App.—San Antonio 2003, pet. denied). Upon a party's application, the court "***shall*** confirm [an] award . . . [u]nless grounds are offered for vacating, modifying, or correcting [it]." TEX. CIV. PRAC. & REM. CODE § 171.087 (West 2015) (emphasis added); *see also* 9 U.S.C. § 9 ("…the court must grant [an order confirming the award] unless the award is vacated, modified, or corrected…."). "A mere mistake of fact or law alone is insufficient to set aside an arbitration award." *Anzilotti v. Gene D. Liggin, Inc.*, 899 S.W.2d 264, 266 (Tex. App.—Houston [14th Dist.] 1995, no writ). Furthermore, when reviewing an arbitration award, courts are "not limited to the arbitrator's explanation for his award." *Xtria L.L.C. v. Int'l Ins. Alliance, Inc.*, 286 S.W.3d 583, 591 (Tex. App.—Texarkana 2009, pet. denied) (citing *JJ-CC, Ltd. v. Transwestern Pipeline Co.*, No. 14-96-1103-CV, 1998 WL 788804, at *4 (Tex. App.—Houston [14th Dist.] Nov. 12, 1998, no pet.)).

Courts "must indulge every reasonable presumption to uphold arbitration awards." *Anzilotti*, 899 S.W.2d at 266. When "a non-prevailing party seeks to

modify or vacate an arbitrator's award, he bears the burden to bring forth a complete record that establishes his basis for relief." *Id.* at 267 (citing *Kline v. O'Quinn*, 874 S.W.2d 776, 790 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (op. on reh'g)). And where, as here, the non-prevailing party alleges that the Arbitrator exceeded his power, the non-prevailing party's burden is a heavy one. *IQ Holdings, Inc. v. Villa D'Este Condominium Owners' Ass'n Inc.*, __ S.W.3d. __, No. 01-11-00914-CV, 2014 WL 982844, at *3 (Tex. App.—Houston [14th Dist.] Mar. 13, 2014, no pet.).

## II. Applying Texas law: the Award must be upheld.

Appellants raise two main issues on appeal. Appellants' Joint Brief at xiv. First, Appellants claim that the trial court erred in confirming the Award because the Arbitrator exceeded his authority under the Company Agreement. *Id.* at 23–31. Appellants also sprinkle this first issue with various evidentiary challenges to the Award. *Id.* at 15–31. Second, Appellants claim that the trial court erred in confirming the Award because the Award violated an extraordinary, fundamental public policy by awarding a double recovery. *Id.* at 31–42. As a remedy for these supposed deficiencies, Appellants ask the Court to modify the Award so that the Award declares that Dr. Bentz was properly expelled and that Appellants did not breach the Company Agreement. Appellants' Joint Brief at 42–47.

As described more fully below, Appellants' claims fail because: (A) without a complete record of the arbitration proceedings, Appellants cannot overcome the strong presumption in favor of upholding the Award; (B) the Arbitrator properly exercised his Section 9.02 authority to decide all disputes related to the Company Agreement other than those disputes decided under Section 9.01; (C) the Arbitrator did not award a double recovery, but regardless, awarding a double recovery does not warrant vacatur; and (D) even if the Court questions the trial court's confirmation of the Award, it cannot order the modification that Appellants request.

### A. Without a complete record of the arbitration proceedings, Appellants cannot overcome the presumption in favor of upholding the Award.

When "a non-prevailing party seeks to modify or vacate an arbitrator's award, he bears the burden to bring forth a ***complete record*** that establishes his basis for relief." *Anzilotti*, 899 S.W.2d at 267 (emphasis added) (citing *Kline*, 874 S.W.2d at 790). "A court must have a sufficient record of the arbitral proceedings, and complaints must have been preserved, all as if the award were a court judgment on appeal." *Nafta Traders Inc. v. Quinn*, 339 S.W.3d 84, 101 (Tex. 2011). In order to be a *complete* record, the record must include a full transcript of the arbitration hearing. *Statewide Remodeling, Inc. v. Williams*, 244 S.W.3d 564, 569 (Tex. App.—Dallas 2008, no pet.) (where party claimed arbitrator committed a

gross mistake and awarded a measure of damages not requested, appellate court held that it "[could not] conclude the trial court erred in holding [the party] to the burden of bringing forth a complete record of the arbitration proceedings, including a transcript of the arbitration hearing."). Absent a transcript of the arbitration, "[n]either the attorneys' recollection of what testimony was or was not before the arbitrator nor the attachments to the motion to vacate provide a complete record of the arbitration proceedings." *Statewide Remodeling*, 244 S.W.3d at 569.

Where, as here, the non-prevailing party fails to provide the court with a complete record, the court must presume that the evidence supports the arbitration award and uphold that award. *See Nafta Traders*, 339 S.W.3d at 102 ("If error cannot be demonstrated, an award must be presumed correct."); *Goldman v. Buchanan*, No. 05-12-00050-CV, 2013 WL 1281744, at *3 (Tex. App.—Dallas Mar. 21, 2013, no pet.) (where party sought vacatur award on basis that arbitrators exceeded their powers but "failed to introduce a record of the arbitration proceedings before the district court," appellate court had to "presume the evidence supported the award" and therefore affirmed award's confirmation); *Schuster v. Wild*, No. 13-13-00474-CV, 2015 WL 251564, at *5 (Tex. App.—Corpus Christi Mar. 5, 2015, pet. denied) (op. on reh'g) (reversing the trial court's vacatur of arbitration award based on the arbitrator exceeding his authority because "without a transcript of the arbitration proceedings, [the court is] required to presume that

the evidence adequately supported [the award]"). The informal nature of arbitration does not release a party from its burden to bring forward a complete record, because "[w]ithout a record," a court "cannot conclusively determine the basis for the arbitrator's award. . . ."[7] *Vorwerk v. Williamson County Grain*, No. 03-10-00549-CV, 2012 WL 593481, at *6 (Tex. App.—Austin Feb. 23, 2012, pet. denied) (citing *GJR Mgmt.*, 126 S.W.3d at 263 and *Statewide Remodeling,* 244 S.W.3d at 569–70). Appellants claim that a complete record of the arbitration proceedings is not required for this Court to determine that the Arbitrator exceeded his authority. Appellants' Joint Brief at 15. That is incorrect, and Appellants have cited no cases in which an appellate court ruled that an arbitrator exceeded his authority while relying on an incomplete record. Instead, Appellants cite *Centex/Vestal v. Friendship West Baptist Church*, which does not support their argument. 314 S.W.3d 677 (Tex. App.—Dallas 2010, pet. denied).

In *Centex/Vestal*, the non-prevailing party brought forth no record at all as to one claim the arbitrator decided. *Id*. at 687. Accordingly, the court concluded that the "failure to bring forth a complete record of the arbitration proceeding [was]

---

[7] The Supreme Court aptly described the public policy supporting the requirement that a party bring forth a complete record on appeal: "For efficiency's sake, arbitration proceedings are often informal; procedural rules are relaxed, rules of evidence are not followed, and no record is made. These aspects of arbitration, which are key to reducing costs and delay in resolving disputes, must fall casualty to the requirements for full judicial review. The parties can decide for themselves whether the benefits are worth the additional cost and delay, but the only review to which they can agree is the kind of review courts conduct." *Nafta Traders*, 339 S.W.3d at 101–02.

fatal" to the claim for vacatur. *Id*. As to other claims the arbitrator decided, the court considered the limited record provided to it and determined that the arbitrator acted within his authority on those claims. *Id*. at 685–86. In deciding that the arbitrator did not exceed his authority, the court considered the partial record, but "presume[d] any remaining evidence support[ed] the Award." *Id*. at 685. And in the end, the court found that the arbitrator did not exceed his authority in deciding those claims. *Id*. at 686. This Court is presented with a similar situation; Appellants provided only a limited record, so the Court must "presume any remaining evidence supports the Award." *Id*. at 685. As explained more fully below, this presumption defeats Appellants' claim for vacatur.

1. **The issues decided by the Arbitrator were submitted in the arbitration, and without a complete record, the trial court had to presume that they were submitted.**

Appellants claim that the Arbitrator issued an Award on issues not submitted to him. Appellants' Joint Brief at 23–27. However, the Arbitrator did not rule on any issues not submitted to him, and, moreover, the Court must reject Appellants' claim to the contrary because the Court "do[es] not have a record of the arbitration and [is] unable to determine what claims were submitted or what evidence was offered before the arbitrator[]." *Kline*, 874 S.W.2d at 783. Without a record of the hearing, the court "ha[s] no way of knowing whether a fact issue was raised, or for that matter, whether certain issues were tried by consent." *Brockman v. Tyson*, No.

01-03-01335-CV, 2005 WL 2850128, at \*4 (Tex. App.—Houston [1st Dist.] Oct. 27, 2005, pet. denied). Accordingly, "[w]ithout a transcription of the arbitration proceedings, [the court] must presume adequate evidence to support the award." *Kline*, 874 S.W.2d at 783 (citing *House Grain Co. v. Obst*, 659 S.W.2d 903, 906 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.)).

### 2. The evidence supported the damages awarded, and without a complete record, the trial court had to presume that it did.

Appellants next claim that the Award failed the "essence" test because it is not "rationally inferable" from the agreement. Appellants' Joint Brief at 28. They also argue that the Award constitutes an impermissible double recovery. *Id.* at 31–34. The validity of these arguments implicates factual and legal questions, both of which were fully briefed and argued to the Arbitrator, but most of those briefings and arguments are not part of the record before this Court.

As more thoroughly explained to the Arbitrator through briefing, oral argument, and expert testimony, awarding Dr. Bentz the Fair Market Value of his interest and his share of distributions compensates Dr. Bentz for two different injuries. First, awarding Dr. Bentz the Fair Market Value of his interest compensates Dr. Bentz for the Company's failure to purchase Dr. Bentz's 20% membership interest after it elected to do so. C.R. 1489. Second, awarding Dr. Bentz damages equal to the distributions the Individual Appellants wrongfully appropriated compensates Dr. Bentz for the membership distributions he should

have received while he remained a member of the Company. C.R. 1490. Thus, Dr. Bentz was awarded separate damages for the violation of two separate contractual rights—his right to the purchase price of his membership interest and his right to distributions while he remained a member.

At the arbitration hearing, Appellants' own damages expert conceded that awarding Dr. Bentz the Fair Market Value and his share of distributions would not be a double recovery if Dr. Bentz were found to still be a member of the Company after expulsion—which is, in fact, what the Arbitrator found. C.R. 1489. This testimony is not included in the appellate record because Appellants failed to provide the trial court with a complete record. But, without a complete record of the hearing, Appellants cannot rebut the presumption that the evidence supported the award of Fair Market Value and distributions—and, in fact, it did.

In an instructive case, *CC Williams Construction Co., Inc. v. Rico*, the non-prevailing party sought vacatur on the basis that the arbitrator exceeded his authority and granted a double recovery to the prevailing party, but the non-prevailing party failed to provide a transcript of the hearing. No. 09-10-00472-CV, 2011 WL 2135074, at *2–3 (Tex. App.—Beaumont May 19, 2011, no pet.). This failure was fatal to the claim for vacatur. *Id.* The court held:

> The record does not indicate that the [non-prevailing party] provided the trial court with a complete record, *i.e.,* a transcript of the arbitration proceedings. *See Williams*, 244 S.W.3d at 569 (Finding that the trial court did not err by requiring non-prevailing party to

provide a transcript of arbitration proceedings, even when no such transcript was made and the party provided affidavits, exhibits, and an attorney's testimony regarding what occurred at the arbitration proceeding). The [non-prevailing party's] grounds for vacatur all depend on the evidence offered and considered by the arbitrator and the manner in which the arbitrator conducted the proceedings, none of which the record contains. . . . We, therefore, presume that the arbitration evidence supported the award. . . .

Under these circumstances, we conclude that the trial court erred by refusing to confirm the arbitration award and by setting aside and vacating the award.

*Id*. at *3.

Recently, the Fourteenth Circuit Court of Appeals issued another instructive opinion in *Mega Builders, Inc. v. Paramount Stores, Inc.* No. 14-14-00744-CV, 2015 WL 3429060 (Tex. App.—Houston [14th Dist.] May 28, 2015, no pet. h.). In *Mega Builders*, the appellant argued that the arbitrator "double count[ed]" a sum awarded to the appellee. *Id*. at *2. As in *CC Williams Construction*, however, the appellant's failure to provide a record of the arbitration proceedings proved fatal to its claim for vacatur. *Id*. at *3. The court explained:

[B]ecause we have no record of the arbitration proceedings, we cannot determine whether the two entries constitute a double counting, as [the appellant] alleges, or whether the two entries were intentionally included in the calculation of the award based on the evidence submitted to the arbitrator, as [the appellee] argues. Absent a record, we must presume that the record supports the arbitrator's determination of the proper amount of the award.

*Id*.

Here, as in *CC Williams Construction* and *Mega Builders*, Appellants have not met their burden to provide a complete record. Accordingly, the Court must presume that the record that it lacks supports the Award.

### 3. Appellants conceded the value of Dr. Bentz's membership interest, and without a complete record, the trial court could not find otherwise.

The lack of a complete record requires the Court to reject Appellants' argument that the Arbitrator exceeded his powers by deciding a dispute as to the Fair Market Value of Dr. Bentz's interest. In support of their argument, Appellants cite seven pages of an unofficial transcript from the opening presentations during the first day of the hearing. Appellants' Brief at 21 (citing C.R. 1787–93). But even this unofficial transcript demonstrates the Individual Appellants' willingness for the Arbitrator to award Dr. Bentz the Fair Market Value of his interest as long as it was within the range decided in the Section 9.01 proceeding:

> Mr. Mussalli: What I think would help us is, you know, if there's an agreement that, you know, if say let's allow Mr. Wood to determine – there's the word determine again – let's allow Mr. Wood to choose, so to speak, as long as you don't exceed the higher number.

C.R. 1790 at 74:11–16.

Appellants' reliance on arguments presented at the hearing underscores the very reason that Texas law imposes a burden upon the non-prevailing party to bring forth a complete record of the arbitration: the Court cannot review the propriety of the Arbitrator's exercise of his powers without a record of what

happened. Here, the lack of a complete record prevents the Court from reviewing the testimony and arguments from the rest of the hearing. And what happened at the rest of the hearing is important.

Over the course of the hearing, Appellants did not argue that $526,796 was not the Fair Market Value. Rather, as the Arbitrator stated in the Award, "[a]ll Parties [] acknowledged. . . that the appropriate Fair Market Value of Dr. Bentz's Membership Interests [was] $526,796." C.R. 1489. The Court must presume the truthfulness of the Arbitrator's statement. *See Turner v. Package Exp., L.P.*, No. 14-12-00241-CV, 2013 WL 2149786, at *6 n.8 (Tex. App.—Houston [14th Dist.] May 16, 2013, no pet.) (because the arbitrator's award stated that the non-prevailing party "stated in his Closing Brief that he did not want to pursue any claims against [the prevailing party]," and the Closing Brief was not included in the appellate record, the court presumed that the Closing Brief supported the arbitrator's decision). Therefore, although Appellants now claim that the Arbitrator improperly decided a dispute as to the Fair Market Value of Dr. Bentz's interest, the Award reflects that, by the close of the hearing (at the latest), there was no longer a dispute as to the Fair Market Value. Had a full record of the hearing been made, it would show that the Arbitrator did not exceed his powers. But without a complete record, the Court must abide by the presumption in favor of upholding the Award.

**B.** **The Arbitrator properly exercised his broad authority under Section 9.02 to decide all disputes other than those decided under Section 9.01.**

Appellants claim that the Arbitrator exceeded his authority in issuing the Award. Appellants' Joint Brief at xiv. When deciding whether an arbitrator acted within his jurisdiction, the "appropriate inquiry is not whether the arbitrator decided an issue correctly, but instead whether he had the authority to decide the issue at all." *Forest Oil Corp. v. El Rucio Land and Cattle Co., Inc.*, 446 S.W.3d 58, 81 (Tex. App.—Houston [1st Dist.] July 24, 2014, pet. filed) (citing *D.R. Horton—Texas, Ltd. v. Bernhard*, 423 S.W.3d 532, 534 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)). Further, "there is a presumption that the arbitrator's actions were within his authority, and [the Court] [must] resolve all doubts in favor of the award." *Barton v. Fashion Glass and Mirror, Ltd.*, 321 S.W.3d 641, 646 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Prudential Sec. Inc. v. Marshall*, 909 S.W.2d 896, 899 (Tex. 1995). The burden is therefore "on the party challenging the award to prove the arbitrator acted outside his authority." *Id.* "[W]hen, as here, there is a broad arbitration clause, arbitration of a particular claim should not be denied unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the dispute.'" *Centex/Vestal*, 314 S.W.3d at 685–86 (quoting *Kline*, 874 S.W.2d at 782).

In support of their claim that the Arbitrator exceeded his authority, Appellants make several faulty arguments. They argue that the Arbitrator did not have authority to award Dr. Bentz the Fair Market Value of his interest and distributions because those remedies were barred by Section 9.01. Appellants' Joint Brief at 21–23. They also argue that there was no agreement to award Dr. Bentz a "buyout." *Id.* at 22–27. Finally, they argue that the Award fails the "essence" test because it was not "rationally inferable" from the agreement. *Id.* at 28.

These arguments fail for several reasons: (1) Section 9.02 of the Company Agreement gave the Arbitrator the authority to decide all disputes related to the Company Agreement other than disputes resolved pursuant to Section 9.01, and none of the disputes the Arbitrator decided were, or even could have been, decided under Section 9.01; (2) the Arbitrator had authority to decide the appropriate remedies for the disputes submitted to him under Section 9.02; and (3) the Award was rationally inferable from the Agreement, as shown by the Arbitrator's well-reasoned discussion in the Award.

1. **Section 9.02 gave the Arbitrator authority to decide all disputes related to the Company Agreement other than disputes resolved pursuant to Section 9.01, and none of the disputes the Arbitrator decided were, or could have been, decided under Section 9.01.**

Appellants have not met their burden to prove the arbitrator acted outside his authority. Section 9.02 gave the Arbitrator authority to "any dispute under [the Company Agreement] which is not otherwise resolved pursuant to other procedures under Section 9.01…." C.R. 128–29 at § 9.02; *see also Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 267–71 (Tex. 1992) (reading a provision allowing for disputes "*under the Contract* [to] be submitted to arbitration…" broadly and, accordingly, holding arbitration of DTPA claims proper because DTPA claims were "intertwined" with contract claims) (emphasis added). And Section 9.01 provided procedures for deciding only three types of disputes: (1) who would serve as the party-appointed appraiser for purchasers of a membership interest; (2) who would serve as the common appraiser; and (3) which party-appointed appraiser's opinion on the Fair Market Value of a membership interest would be controlling. C.R. 127 at § 9.01. ***Thus, Section 9.02 granted the Arbitrator authority to decide all other disputes related to the Company Agreement.***

The controlling opinion on Fair Market Value had been determined under Section 9.01 prior to the Section 9.02 arbitration that resulted in the Award. *See*

C.R. 128–29 at § 9.02 (establishing the Arbitrator's broad authority); Appellants' Joint Brief at 26 ("The Section 9.01 proceeding was concluded on January 3, 2014.") The Arbitrator then relied on the controlling opinion in issuing the Award. The Arbitrator awarded Dr. Bentz the Fair Market Value of his interest, which Appellants conceded was $526,796—a valuation taken directly from the controlling Fair Market Value opinion. C.R. 1489. In other words, rather than invading the Section 9.01 proceeding, as Appellants erroneously allege, the Arbitrator properly *relied* on the result of the Section 9.01 proceeding. *See id.* Appellants also argue that the Arbitrator awarded a "buyout," which they allege was a Section 9.01 matter. Appellants' Joint Brief at 23. Appellants are incorrect on this point in two respects. First, Appellants claim the award included a buyout "similar to the old shareholder oppression cases. . . ." Appellants' Joint Brief at 27. But the Arbitrator did not award a "buyout" as a remedy in tort; rather, the Arbitrator enforced the Company Agreement. Because the Company breached the option to purchase Dr. Bentz's interest, the Arbitrator enforced the option by ordering the Company to pay Dr. Bentz the purchase price for his interest, and by requiring Dr. Bentz to relinquish that interest. C.R. 1489.

Second, regardless of whether enforcing the option constitutes a "buyout," the fashioning of remedies is not a Section 9.01 matter. There is no provision in Section 9.01 for ruling on a party's cause of action or awarding a party any type of

damages—those disputes are left to the broad arbitration authority of Section 9.02. *Compare* C.R. 128—29 at §9.02 (establishing Section 9.02's broad arbitration authority) *with* C.R. 127–28 at § 9.01 (carving out from Section 9.02's broad arbitration authority narrow issues for determination under Section 9.01). Thus, whether enforcing the option (or even awarding a supposed "buyout") was a proper remedy was a determination to be made in the Section 9.02 proceeding.

Here, the Arbitrator awarded Dr. Bentz the purchase price for his membership interest because the Company breached the Company Agreement when it elected to exercise its option to purchase Dr. Bentz's membership interest but then failed to hold a closing and make the payment by the contractually-mandated deadline. C.R. 1489. Whether the Company breached the Company Agreement and what the remedy for that breach would be were both issues that could not be resolved by the limited procedures of Section 9.01 but instead fell squarely within the broad arbitration authority of Section 9.02 that Appellants agreed to by entering into the Company Agreement.

### 2. The Arbitrator had authority to decide the appropriate remedies for the disputes submitted to him under Section 9.02.

Appellants claim that the Arbitrator exceeded his authority because there was "no agreement to award a buyout. . . ." Appellants' Joint Brief at 23 (capitalization removed). In supposed support, Appellants claim that Dr. Bentz did

not plead or submit a request for a "buyout" if he was properly expelled. *Id.* at 26. To begin with, this argument is off-base because the Arbitrator did not award a "buyout"; he enforced the Company Agreement and awarded Dr. Bentz damages for the Company's breach thereof. C.R. 1489. Further, this argument misses the mark because: (a) there was no requirement that the parties agree to the remedies selected by the Arbitrator, and (b) Dr. Bentz did seek to recover the Fair Market Value of his interest, but regardless, that was an issue for the Arbitrator to decide.

### a. There was no requirement that the parties agree to the remedies selected by the Arbitrator.

Appellants argue that awarding Dr. Bentz the Fair Market Value of his interest was a "buyout," and that the Arbitrator could not award this "buyout" unless the parties agreed to it. Appellants' Joint Brief at 23. As noted above, the Arbitrator did not award a "buyout"; he simply enforced the Company Agreement and awarded Dr. Bentz damages for the Company's breach thereof. Appellants' argument fails regardless because the parties agreed to arbitrate any dispute related to the Company Agreement (other than a dispute resolved under Section 9.01), and in doing so, they agreed to subject themselves to Texas arbitration law, which gives arbitrators "broad discretion in fashioning a remedy appropriate to the case." *Roe v. Ladymon*, 318 S.W.3d 502, 523 (Tex. App.—Dallas 2010, no pet.). Indeed, "[t]he fact that the relief granted by the arbitrator[] could not or would not be granted by a court of law or equity is not a ground for vacating or refusing to

confirm the award." TEX. CIV. PRAC. & REM. CODE § 171.090 (West 2015). Thus, Texas law does not require parties to an arbitration agreement to agree on what remedies may be granted.

In supposed support of their argument, Appellants cite *Fortune v. Killebrew*, *Gulf Oil Corp. v. Guidry*, and *Burlington Resources Oil & Gas Co., LP v. San Juan Basin Royalty Trust*. Appellants' Joint Brief at 24–26. None of these cases are analogous to this dispute.

In *Fortune,* the arbitration agreement only called for arbitration to "determine the amount received by each legatee, and the amount that each was entitled to out of the estate. . . ." 23 S.W. 172, 176 (Tex. 1893). The court held that the arbitrators exceeded their authority by awarding transfer of land to the executor, rather than just determining the amount that the executor should have received. *Id*. at 176–77. In that case, the award of land clearly did not fall under the narrow arbitration provision. *Id*. Here, on the other hand, Section 9.02 is a broad arbitration provision under which the Appellants agreed that the Arbitrator would decide *all* disputes related to the Company Agreement that were not resolved under Section 9.01. *See* C.R. 128–29 at § 9.02 (providing that "any Dispute under [the Company Agreement] which [was] not otherwise resolved pursuant to other procedures under Section 9.01" would be decided by arbitration under Section 9.02).

In *Gulf Oil Corp. v. Guidry*, the arbitrators were given very limited authority; they were only tasked with determining whether or not an employee was discharged for cause. 327 S.W.2d 406 (Tex. 1959). Instead of limiting their decision to only that issue, the arbitrators determined that "the discharge was discriminatory; it would be set aside, the employee would be demoted, and would receive back pay." Appellants' Joint Brief at 25 (citing *Guidry*, 327 S.W.3d at 141–42). Like the *Fortune* arbitrators, the *Guidry* arbitrators received limited authority under the arbitration agreement, and their award clearly exceeded that authority. But like *Fortune*, *Guidry* is not analogous to the dispute before this Court because the Company Agreement here gave the Arbitrator broad authority, which he properly exercised.

Finally, *Burlington Resources* is also distinguishable. 249 S.W.3d 34 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). In *Burlington Resources*, the arbitration agreement at issue applied only to certain existing disputes which were listed in an exhibit to the agreement. *Id*. at 37–38. The court vacated a portion of the award because that portion was based on a dispute that was "not mentioned" in the agreement. *Id*. at 45. Here, unlike in *Burlington Resources*, the arbitration agreement did not limit arbitration to any specific, then-exiting disputes. C.R. 128–29 at § 9.02. Thus, none of the cases relied upon by Appellants support their theory.

**b. Dr. Bentz did seek to recover the Fair Market Value of his interest, but regardless, this was an issue for the Arbitrator to decide.**

Appellants attempt to support their argument that there was no agreement to award Dr. Bentz the Fair Market Value of his membership interest by claiming that Dr. Bentz did not plead or submit a request for a "buyout" in the event the Arbitrator found that Dr. Bentz was properly expelled. Appellants' Joint Brief at 25–28. However, whether Dr. Bentz pled a claim for breach of contract and sought damages in the amount of the already-determined Fair Market Value of his membership interest is inapposite, because arbitrations do not follow the same procedural rules as court cases. Instead, "the enforcement of pleading requirements before the arbitrator is a procedural matter for the arbitrator." *Kline*, 874 S.W.2d at 782 (citing *USX Corp. v. West*, 781 S.W.2d 453, 456 (Tex. App.—Houston [1st Dist.] 1989, no writ)) (where respondent claimed arbitrators erred in awarding punitive damages even though claimant had not plead punitive damages, the court "defer[red] to the arbitrators with regard to procedural matters such as the sufficiency of [respondent's] pleadings").

Furthermore, the Arbitrator did in fact rule only on the issues before him, and the Court must reject Appellants' claim to the contrary because the Court "do[es] not have a record of the arbitration and is unable to determine what claims

were submitted or what evidence was offered before the arbitrator[]."[8]  *Id*. at 783.

Without a complete record of the hearing, the Court has "no way of knowing whether a fact issue was raised, or for that matter, whether certain issues were tried by consent."  *Brockman*, 2005 WL 2850128, at *4.  The Court must therefore reject Appellants' argument on this point.

### 3. The Award was rationally inferable from the Agreement, as shown by the Arbitrator's well-reasoned discussion in the Award.

Appellants claim that the Award failed the "essence" test because, they claim, the Award does not "'have a basis that is at least rationally inferable, if not obviously drawn from the letter and purpose of the contract.'"  Appellants' Joint Brief at 28; *Executone Info Sys., Inc. v. Davis*, 26 F.3d 1314, 1325 (5th Cir. 1994).  In support of this argument, Appellants assert that the Arbitrator incorrectly determined that Dr. Bentz was a member of the Company after his expulsion.  *Id*. at 28.  Appellants' position is untenable because: (a) the essence test does not allow the non-prevailing party to retry the dispute, and, in any event, (b) the

---

[8] In fact, Appellants' claim that Dr. Bentz did not submit this issue in the arbitration is directly contradicted by a document they did not put into the record.  One Section of Dr. Bentz's prehearing brief was entitled, "**Even if the Respondents properly expelled Dr. Bentz, they have still breached the Company Agreement[] by failing to pay him Fair Market Value of his Membership Interest.**"  *See* Appendix 11, Excerpts from Dr. Bentz's Prehearing Brief at 39 (emphasis in original).  This brief is not in the appellate record because Appellants failed to provide a complete record to the trial court, but Appellants should not be allowed to benefit from that failure—this is the very reason appellants are required to bring forward complete records of arbitration proceedings in the first place.

Arbitrator correctly determined that Dr. Bentz was still a member after expulsion and prior to the sale of his membership interest.

### a. The essence test does not allow the non-prevailing party to retry the dispute.

Appellants' essence test argument is yet another attempt to recast their arguments on the merits as jurisdictional arguments. But, as the *Executone* case cited by Appellants makes clear, the essence test does not permit courts to retry the merits of an arbitration. Rather, in applying the essence test, "[t]he Court looks only to the result reached." *Id.* (quoting *Anderman/Smith Operating Co. v. Tennessee Gas Pipeline Co.*, 918 F.2d 1215, 1219 n.3 (5th Cir. 1990)). A "remedy lies beyond the arbitrator's jurisdiction only if 'there is no rational way to explain the remedy handed down by the arbitrator as a logical means of furthering the aims of the contract.'" *Id.* (quoting *Brotherhood of R.R. Trainmen v. Central of Ga. Ry.*, 415 F.2d 403, 412 (5th Cir. 1969), *cert. denied*, 396 U.S. 1008 (1970)). In applying the essence test, the Court is not "limited to the arbitrator's explanations for his award. . . ." *Id.* (quoting *Anderman/Smith*, 918 F.2d at 1219 n.3.).

In *Ancor Holdings, L.L.C. v. Peterson, Goldman & Villani, Inc.*, another case Appellants rely upon, the court further explains the essence test as follows:

> Our inquiry here is not one of contract interpretation. Rather, we look to whether the arbitrator's award "was so unfounded in reason and fact, so unconnected with the wording and purpose of the [contract] as to 'manifest an

infidelity to the obligation of the arbitrator'" such that the arbitrator failed to interpret the [contract] at all. . . .

294 S.W.3d 818, 830–31 (Tex. App.—Dallas 2009, no pet.) (emphasis added). Thus, under the essence test, "[e]ven if the arbitrator made a mistake in the application of the law. . . such a mistake is not a ground for vacating an arbitrator's award." *Id.* at 833.

Here, as in *Ancor Holdings*, the Award does not "manifest an infidelity" to the Arbitrator's obligations. Like the arbitrator in *Ancor Holdings*, "it is clear from the [A]rbitrator's. . . final award that [he] went through the process of interpreting the [contract] and that [he] considered the wealth of evidence presented to [him]." *Id.* at 831. Indeed, the Award shows that the Arbitrator issued the Award after "having read the pleadings, heard the testimony, reviewed the relevant documents, listened to argument of counsel, read and considered the briefs and the post-hearing submissions, after full consideration of the record upon due deliberation, construing the contracts and applying Texas law. . . ." C.R. 1492. For these reasons, the Award passes the essence test.

### b. The Arbitrator correctly determined that Dr. Bentz was still a member after expulsion.

Even if the essence test allowed a court to review the merits of the Arbitrator's decision—which it does not—the Award would pass the test because the Arbitrator correctly determined that Dr. Bentz was still a member after

expulsion and prior to the sale of his membership interest. Dr. Bentz's membership interest was his personal property, and Appellants have pointed to no evidence that Dr. Bentz had transferred his interest to anyone. *See* TEX. BUS. ORGS. CODE § 101.106 (West 2015) ("A membership interest in a limited liability company is personal property.") Further, nothing in the Company Agreement suggests that a member stops being a member upon expulsion or that his membership interest gets "absorbed." To the contrary, the Company Agreement suggests that a member continues to be a member until his interest is transferred—which, here, did not happen before the arbitration hearing.

Under the Company Agreement, upon expulsion "the Company and the other Members shall have an option (but not an obligation) to purchase all of the Membership Interest owned by such. . . expelled Member. . . at the Fair Market Value determined as of the last day of the calendar month preceding the date of the. . . expulsion of such Member." C.R. 114 at § 2.05. If the Company or other Members exercise this option, they must do so within "180 days following the expulsion of [the] Member. . . ." *Id.* The party exercising the option must pay for the Membership Interest "at a closing, held on a business day not more than 30 days after the time for electing to purchase the interest lapses, all in cash or by cashier's check. . . ." C.R. 115 at § 2.08. If there is a dispute over the Fair Market Value, the deadline for closing is stayed until "the determination has been made by

the common appraiser as to which opinion is the controlling opinion. . . ." C.R. 115, 127–28. "At the closing, the selling party shall deliver instruments of conveyance and assignment of the appropriate amount of the Membership Interest. . ." and "the purchasers shall pay the purchase price. . ." C.R. at 115 at § 2.08. "Upon transfer of any membership interest in the Company. . . the items of income and loss attributable to the Company Rights shall be apportioned between the assignor and the assignee as of the last day of the month preceding the transfer (the deemed transfer date) based on the results of Company operations through that deemed transfer date." C.R. 119 at § 4.03.

Based on the foregoing provisions, Appellants had a choice regarding whether to purchase Dr. Bentz's membership interest upon expulsion. If they chose to purchase it, they had to exchange the purchase price for documents conveying the membership interest at a closing. The Company would continue to allocate profits and losses to Dr. Bentz until the deemed transfer date. If Appellants did not choose to purchase Dr. Bentz's membership interest, then no transfer would occur, and the Dr. Bentz would remain a Member. Under this scheme, if an expelled member lost his interest immediately upon expulsion (as Appellants allege), there would be no reason for the Company Agreement to provide an option to purchase an expelled member's interest at all.

The Arbitrator agreed with this analysis of the Company Agreement:

If a Texas limited liability company chooses to alter, in its company agreement, the statutory rule that a Member may not be expelled, it must make very clear all of the consequences of expulsion. In construing such an agreement no rights or consequences that are not specifically provided for should be assumed. . . . The Agreements do *not* say that a Member's Interest is terminated, forfeited or lost upon expulsion. Or that he shall, from that point, cease to be a Member and his Sharing Ratio be reduced to zero. Instead Section 2.05 of the Agreements demonstrates that an expelled Member retains his Membership Interest. The Company and the other Members have an option to purchase all of the Membership Interest owned by the expelled Member. . . . The existence of the option itself recognizes that the Membership Interest survives expulsion. . . .

Common sense, logic and a careful reading of the Agreements compel that, until paid for his Interest, a Member, even an expelled Member, is entitled to his share of distributions made by the Company.

C.R. 1490.

Now, for the first time on appeal, Appellants complain that this interpretation of the Company Agreement treated Dr. Bentz "as if he was a Member rather than a Disputed Membership Interest." Appellants' Joint Brief at 28–31. To be clear, Dr. Bentz was not a disputed membership interest—he owned one. Under the Company Agreement, a "disputed membership interest" is a membership interest, the Fair Market Value of which is in dispute. *See* C.R. 1461 at § 9.01(a). Dr. Bentz was therefore not a disputed membership interest—he was an expelled member who owned a membership interest the Fair Market Value of

which was in dispute. An expelled member is still a member and a disputed membership interest is still a membership interest. There is nothing in the Company Agreement that suggests a member stops being a member when the Fair Market Value of his membership interest is in dispute. Dr. Bentz therefore remained a member after expulsion and prior to the transfer of his membership interest, and the Arbitrator properly decided this issue.

### C. The Arbitrator did not award a double recovery, but even if he had, it would not be grounds for vacatur.

In their second issue, Appellants claim that the Arbitrator violated public policy by awarding Dr. Bentz the Fair Market Value of his membership interest and his pro rata share of the distributions made while he was still a member. Appellants' Joint Brief at 42. Appellants assert that this award violates Texas's prohibition on double recoveries. *Id*. Appellants' argument fails for two reasons: (1) double recoveries do not warrant vacatur; and (2) the Arbitrator did not award a double recovery.

#### 1. Double recoveries do not warrant vacatur.

Regardless of whether the award granted a double recovery, double recoveries do not warrant vacatur because: (a) prohibiting double recoveries is not so fundamental a policy that it would outweigh public policy in favor of upholding arbitration awards, and, in any event, (b) violating public policy is not a ground for vacatur.

### a. Prohibiting double recoveries is not so fundamental a policy that it would outweigh public policy in favor of upholding arbitration awards.

Appellants state that "[i]n order for an award to be vacated as a violation of public policy, the policy at issue must be a carefully articulated fundamental public policy." Appellants' Joint Brief at 34 (citing *CVN Group, Inc. v. Delgado*, 95 S.W.3d 234, 239 (Tex. 2002)). The policy against double recoveries, however, is not the kind of carefully articulated, fundamental policy that could outweigh the public policy in favor of upholding arbitration awards.

Although Texas's prohibition against double recoveries reflects public policy—as all law does—Appellants did not and cannot cite any Texas cases supporting their claim that the policy against double recoveries is the kind of fundamental policy for which a violation justifies vacatur. Instead, Appellants skirt the issue by citing a number of cases reaffirming the notion that double recoveries are against Texas public policy. *See* Appellants' Joint Brief at 37–39 (citing cases for the proposition that "[t]he policy against double recovery is firmly rooted in Texas jurisprudence"). But Appellants miss their mark. The question is not whether Texas has a firmly-rooted policy against double recoveries, but is instead whether the public policy is so fundamental as to require courts to upset the strong presumption in favor of arbitration awards. The answer to the latter question is "no."

At least two courts of appeals have held that awarding a double recovery in arbitration is not grounds for vacatur. In *Black v. Shor*, the Corpus Christi Court of Appeals rejected a non-prevailing party's bid to vacate an arbitration award on the basis that is violated the one satisfaction rule. 443 S.W.3d 154 (Tex. App.—Corpus Christi 2013, pet. denied) The *Black* court held that "[a] trial court should not overturn an arbitration award rendered after honest consideration given to claims and defenses presented to it, no matter how erroneous." *Id*. at 168–69 (Tex. App.—Corpus Christi 2013, pet. denied) (citing *Xtria L.L.C.*, 286 S.W.3d at 598); *Werline v. E. Tex. Salt Water Disposal Co.*, 209 S.W.3d 888, 898 (Tex. App.—Texarkana 2006); *aff'd* 307 S.W.3d 267, 268 (Tex. 2010)). Similarly, in *Roe v. Ladymon*, the Dallas Court of Appeals rejected Appellants' argument that an "award should be modified to eliminate a double recovery of damages," justifying its holding on the arbitrator's "broad discretion in fashioning a remedy appropriate to the case." 318 S.W.3d at 523.

Although Appellants cite several cases analyzing arbitration awards in light of public policy, these cases do not support Appellants' argument. In one of the cases cited by Appellants, *CVN Group, Inc.*, the Supreme Court of Texas *rejected* a public policy attack on an arbitration award, reasoning that the "arbitrator's mere disagreement with a judge does not violate public policy [and] [n]othing in the arbitration proceeding indicate[d] that the arbitrator completely disregarded the

[law].").  95 S.W.3d at 239.  Furthermore, in none of the cases cited by Appellants did the court vacate an award on the basis that it granted a double recovery; rather, those cases vacated awards that violated the Constitution, were unconscionable, encouraged criminality, or violated a statute that prohibited unconscionable conduct.  *See Lee v. El Paso County*, 965 S.W.2d 668 (Tex. App.—El Paso 1998, pet. denied) (affirming vacatur of award that violated Texas Constitution's prohibition on "freely giving away [of] public moneys for services previously rendered…"); *Lee v. Daniels & Daniels*, 264 S.W.3d 273 (Tex. App.—San Antonio 2008, pet. denied) (vacating award that granted lawyer recovery against client for fees lawyer incurred in representing himself in securing withdrawal from ongoing litigation because it was unconscionable for a client to pay a lawyer's fee for service performed for the lawyer's benefit); *Smith v. Gladney*, 98 S.W.2d 351, 352 (Tex. 1936) (vacating award that enforced gambling agreement); *Goodyear Tire & Rubber Co. v. Sanford*, 540 S.W.2d 478, 483–84 (Tex. Civ. App.—Houston [14th Dist.] 1976, no writ) (vacating award that found employer's action proper in terminating employee for filing criminal charges against supervisor prior to exhausting grievance process, because award discouraged disclosure of criminal activity and delayed justice); *Rapid Settlements*, 234 S.W.3d at 793 (affirming injunction against confirmation of award that violated statute requiring court

approval of structured settlement in order to prevent abuses of power against unsophisticated tort claimants).

Unlike the public policies addressed in the cases cited by Appellants, the policy against double recoveries is not the kind of fundamental policy for which a violation warrants vacatur, as the *Roe v. Ladymon* and *Black v. Shor* courts recognized. For the above reasons, the trial court properly honored the public policy in favor of upholding arbitration awards, and this Court should do the same.

### b. Violating public policy is not a ground for vacatur under the Federal Arbitration Act.

Regardless of whether the Award includes a double recovery, the Award should not be vacated because the common law ground for vacatur Appellants assert is no longer a bar to confirmation.

Appellants note that the "[t]he United States Supreme Court has determined that Sections 10 and 11 of the FAA are exclusive of the common law grounds to vacate an award." *Id.* at n. 17. Indeed, the United States Supreme Court has made clear that common law grounds for vacatur no longer bar confirmation of arbitration awards because the grounds for vacatur under the FAA displace and preempt common law grounds for vacatur. *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 522 U.S. 576, 584–89 (2008). Since that decision, this Court held in *Royce Homes, L.P. v. Bates* that, where the FAA applies, state common law grounds for vacatur (like an award violating public policy) do not apply. 315 S.W.3d 77, 90

(Tex. App.—Houston [1st Dist.] 2010, no pet.) ("We have already held that the FAA applies to this case. We conclude that *Hall Street* forecloses any common-law grounds for vacatur of an arbitration award such as manifest disregard of the law and gross mistake."); *see also Petroleum Analyzer Co. LP v. Olstowski*, No. 01-09-00076-CV, 2010 WL 2789016 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (". . . statements that the arbitration panel 'exceeded its power' in granting an award against public policy. . . are statements couched in common law arguments that do not provide valid grounds for vacatur of the arbitrators' award.") (citations omitted).

As Appellants admit, both Federal Arbitration Act ("FAA") and Texas Arbitration Act ("TAA") apply here. Appellants' Joint Brief at 13 (". . . the FAA and TAA apply concurrently."). They admit further that "the FAA supplies the substantive rules of the [confirmation] decision." *Id*. at 14. Because the FAA forecloses common law grounds for vacatur like an award violating public policy, Appellants' public policy challenge to the Award must fail. Furthermore, the cases Appellants cite do not change this analysis because they predated this Court's controlling decision in *Royce Homes*. *Compare Royce Homes*, 315 S.W.3d 77 (2010), *with CVN Group*, 95 S.W.3d 234 (2002), *Smith v. Gladney*, 98 S.W.2d 352 (1936), *Goodyear Tire & Rubber*, 540 S.W.2d 478 (1976), *Lee v. El Paso*

*County*, 965 S.W.2d 668 (1998), *Rapid Settlements*, 234 S.W.3d 788 (2007), and *Lee v. Daniels & Daniels*, 264 S.W.3d 273 (2008).

### 2. The Award compensates Dr. Bentz for separate injuries and therefore does not grant a double recovery.

Appellants claim that the Award granted Dr. Bentz a double recovery, but a double recovery only occurs "when a plaintiff obtains more than one recovery for the same injury." *Waite Hill Services, Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1996) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)). The damages recovered by Dr. Bentz are not duplicative because they compensate Dr. Bentz for separate injuries: the Company's failure to pay Dr. Bentz for his membership interest after electing to purchase it and the Individual Appellants' wrongful appropriation of Dr. Bentz's pro rata share of distributions while Dr. Bentz was still a member of the Company.

Appellants' argument that Dr. Bentz was awarded distributions twice ignores the fact that the "Fair Market Value" is the required purchase price for Dr. Bentz's membership interest— not a reflection of damages sustained by Dr. Bentz *before* the purchase of his membership interest. The purchase price would be the same whether the Company distributed $0 or $3.6 million between the expulsion and purchase, because that is what the parties agreed to. *See* C.R. 118 at § 4.01 ("At such time as determined by the Executive Committee, Net Cash Flow…shall be distributed to the **Members** in proportion to their Sharing

Ratios.") (emphasis added); *see also* C.R. 136 (establishing equal sharing ratios of 20.0% per member).

In creating the Company Agreement, the Company and the members had a number of options to determine what price would be paid to an expelled member on the date of transfer. They could have agreed that the purchase price would be a sum certain. They could have agreed that the purchase price would be a multiple of the profits the Company received in the calendar month preceding the transfer. They even could have agreed that there would be no purchase price, and that an expelled member's interest would simply revert to the Company. But they did not. Instead, they agreed that the purchase price would be the Fair Market Value as determined on the last day of the calendar month preceding the month of the expulsion. C.R. 114 at § 2.05.

By defining the Fair Market Value based on a date preceding expulsion, the Appellants assumed the risk that the value could increase or decrease dramatically between the date of expulsion and the date of purchase—or even between the date of valuation and the date of expulsion. And by allowing a member to remain a member until the transfer of his membership interest, they agreed that the member would receive distributions regardless of the extent to which the purchase price (that is, Fair Market Value) would have been based on an estimate of those distributions.

Thus, it was not a double recovery for the Arbitrator to award Dr. Bentz the contractually-mandated purchase price (Fair Market Value) as damages for the Company's breach of contract in addition to his contractually-mandated share of the membership distributions.

**D.** **Even if the Court were to vacate the Award, it could not order the modification that Appellants request.**

For the first time on appeal, Appellants request to "vacate" the entire Award, except for the Arbitrator's findings that "Dr. Bentz was properly expelled and there was no breach of the [Company] Agreement by the Appellants." Appellants' Joint Brief at 42. There are three problems with this argument. First, the Arbitrator did not find that "there was no breach of the [Company] Agreement by the Appellants." *Id*. The Arbitrator instead explicitly found that the Company's failure to hold a closing and pay Dr. Bentz by the deadline was a breach of the Company Agreement. C.R. 1489.

Second, Appellants request—for the first time on appeal—to modify the Award in a manner that differs from the modification that they requested the trial court make. *See* C.R. 1413–44, 1591–94, 1605–23, 1776–80, 1801–07, and 1953–61. Because Appellants did not present this argument to the trial court, they waived this argument on appeal. *See, e.g., Kline*, 874 S.W.2d at 790–91.

Third, Appellants request modification of the Award—not total vacatur—and the requested modification is impermissible under Texas law.

Section 171.091(a)(2) of the Texas Civil Practice and Remedies Code provides that "the court shall modify or correct an award if…the arbitrators have made an award with respect to a matter not submitted to them and the award may be corrected without affecting the merits of the decision made with respect to the issues that were submitted…." As previously explained, the Arbitrator only decided matters submitted to him. This alone renders the requested modification impermissible under Section 171.091(a)(2).

Additionally, Appellants' requested modifications to the Award are impermissible under Section 171.091(a)(2) because modifying the Award would affect the merits of the Arbitrator's decision. If a court determines that any portion of an award is invalid, and the "invalid portion is not severable and distinct so that the remaining valid part of the award truly expresses the arbitrator's judgment," then "the entire award is void." *City of Waco v. Kelly*, 309 S.W.3d 536, 551 (Tex. 2010) (citing *Guidry*, 327 S.W.2d at 409). If a portion of an award is rejected and any part of the award is to be maintained, "it is indispensable that the part thus allowed to stand should appear to be in no way affected by the departure from the submission." *Guidry*, 327 S.W.2d at 409 (quoting *McCormick v. Gray*, 54 U.S. 26 (1851)).

Here, no portion of the Award was invalid, but if the Court were to decide otherwise, it would have to vacate the entire Award because the issues determined

by the Arbitrator were not severable or distinct. Dr. Bentz's expulsion triggered Appellants' option to purchase Dr. Bentz's membership interest and formed the basis of Appellants' claim that Dr. Bentz was no longer entitled to distributions, so these issues are factually and legally intertwined. Thus, the Court's decision here is all or nothing; it may vacate the entire Award or let the Award stand. And the Court should do the latter.

## CONCLUSION

For these reasons, Dr. Bentz respectfully requests that the Court deny the Appellants' attempt to re-litigate this case, deny the Appellants' request for improper modifications to the Award, and affirm the Judgment confirming the Award.

Dated: July 8, 2015

__/s/ Andrew Price_____

    Andrew Price
    State Bar No. 24002791
    andrew.price@nortonrosefulbright.com
    Rachel Roosth
    State Bar No. 24074322
    rachel.roosth@nortonrosefulbright.com
    James Hartle
    State Bar No. 24082164
    jim.hartle@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

***Counsel for Appellee Alan Bentz, M.D.***

## CERTIFICATE OF SERVICE

I hereby certify that this instrument was served upon all counsel of record—whose information follows—in compliance with Rule 9.5 of the Texas Rules of Appellate Procedure on July 8, 2015.

Robert A. Plessala
Andrews Myers, P.C.
3900 Essex, Suite 800
Houston, Texas 77027


AND


Matthew J. Mussalli
Law Office of Matthew J. Mussalli, P.C.
2441 High Timbers Drive, Suite 220
The Woodlands, Texas 77380

*Counsel for George Davis, MD; Anteneh Roba, MD; Levon Vartanian, MD; and Woodrow Dolino, MD*

Adam M. Looney
The Strong Firm, P.C.
Waterway Plaza One
1720 Hughes Landing Blvd, Suite 200
The Woodlands, Texas 77380


*Counsel for Northwest Houston Emergency Specialist Group, PLLC; ESG MD, PLLC; and ESG MLP, LLC*

_____/s/ Andrew Price_____
Andrew Price

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Texas Rule of Appellate Procedure 9.4(i)(2)(D).  Appellee's Brief contains 12,413 words excluding the parts of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1)).  This brief was prepared with, and the word count generated by, Microsoft Word 2010.  This brief complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) and the type style requirements of Texas Rule of Appellate Procedure 9.4(e) because it uses a proportionally-spaced typeface using Microsoft word in 14-point Times New Roman font.

_____*/s/ Andrew Price*_____
Andrew Price

# APPENDIX 1

# COMPANY AGREEMENT
## of
## NORTHWEST HOUSTON EMERGENCY SPECIALISTS GROUP, P.L.L.C.

### A Texas Professional Limited Liability Company

This COMPANY AGREEMENT of NORTHWEST HOUSTON EMERGENCY SPECIALISTS GROUP, P.L.L.C. (this "*Agreement*"), dated as of July 5, 2006 (the "*Effective Date*"), is (a) adopted by the Managers (as defined in Section 5.01) and (b) executed and agreed to, for good and valuable consideration, by the Members (as defined in Section 2.01).

### Article 1
### Organization

1.01. *Formation.* NORTHWEST HOUSTON EMERGENCY SPECIALISTS GROUP, P.L.L.C. (the "*Company*") has been organized as a Texas professional limited liability company by the filing of a Certificate of Formation (the "*Certificate*") under and pursuant to the Texas Business Organizations Code (as amended from time to time, the "*TBOC*") and the issuance of a certificate of filing for the Company by the Secretary of State of Texas.

1.02. *Name.* The name of the Company is NORTHWST HOUSTON EMERGENCY SPECIALISTS GROUP, P.L.L.C. and all Company business must be conducted in that name or such other names that may be selected by the Executive Committee (as defined in Section 5.01) and that comply with applicable law.

1.03. *Registered Office; Registered Agent; Offices.* The registered office and registered agent of the Company in the State of Texas shall be as specified in the Certificate or as designated by the Executive Committee in the manner provided by applicable law. The offices of the Company shall be at such places as the Executive Committee may designate, which need not be in the State of Texas.

1.04. *Purposes.* The purposes of the Company are to provide and manage physician and medical services and all other purposes under the Certificate or the TBOC for which professional limited liability companies may be formed.

1.05. *Foreign Qualification.* Prior to the Company's conducting business in any jurisdiction other than Texas, the Executive Committee shall cause the Company to comply with all requirements necessary to qualify the Company as a foreign limited liability company in that jurisdiction.

1.06. *Term.* The Company commenced on the date the Secretary of State of Texas issued a certificate of filing for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

1.07. *No State-Law Partnership.* The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than applicable tax laws, and this Agreement may not be construed to suggest otherwise.

## Article 2
## Membership; Dispositions of Interests

2.01.   *Members; Sharing Ratios; Voting Rights.*

(a) *Members.* The members of the Company ("*Members*") are the individuals executing this Agreement as of the date hereof as members and each person that is hereafter admitted to the Company as a member in accordance with this Agreement, provided that, in accordance with section 301.004 of the TBOC, each Member admitted hereunder and hereafter is a physician licensed and duly qualified to provide medical services in the State of Texas and an authorized person, as such term is used in section 301.004 of the TBOC, ("*Authorized Person*"). If a Member shall have made a Disposition of all or any portion of its Membership Interest but shall have retained any rights therein, then solely with respect to the Membership Interest (or portion thereof) so disposed, all references to "Member" that appear in Article 4 and Section 8.02(b) shall be deemed to refer to the assignee of such Membership Interest. The Members collectively shall be referred to as the "*Group.*"

(b) *Sharing Ratios.* The *Sharing Ratio* of each initial Member (each a "*Founding Member*" and collectively the "*Founding Members*") is set forth on **Exhibit A.**

(c) *Voting Rights.* The Founding Members shall each (i) be entitled to vote and (ii) have a voting interest equal to the ratio of such Member's Sharing Ratio to all the Members' entitled to vote Sharing Ratios ("*Voting Sharing Ratios*"). All other Members admitted to the Group shall be non-voting Members and shall not be entitled to vote on any matter pertaining to the Company, including, without limitation, those matters relating to fundamental business transactions and amendments to the Certificate, as specified in section 101.356(c) and (d) of the TBOC, until such Member is given the right to vote by the unanimous consent of the Executive Committee.

2.02.   *Dispositions of Membership Interests.* A Member may not make a sale, assignment, transfer, conveyance, gift, exchange, or other disposition (voluntarily, involuntarily, or by operation of law) ("*Disposition*") of all or any portion of its rights or interest in the Company ("*Membership Interest*"), except in accordance with the provisions of this Agreement.

2.03.   *Disposition by a Member.* In the event a Member shall Dispose of any of such Member's Interest, for any reason whatsoever, to any person or entity who is not already a Member at the time of the Disposition, then (a) the transferee of such interest shall be an assignee of such interest in accordance with the TBOC, provided that such assignee is an Authorized Person in accordance with section 301.009 of the TBOC, but shall not be a Member unless and until expressly admitted to the Company as provided in Section 2.10 of this Agreement; and (b) the Company and the Members shall have the rights and options provided for in this Article 2.

2.04.   *Voluntary Disposition.* At any time following the third anniversary date of a Member being admitted to the Company or upon the termination or cessation of a Member's right to practice medicine at the Houston Northwest Medical Center hospital in Houston, Texas (the "*Hospital*"), a Member may transfer his membership interest upon the unanimous written consent of the Executive Committee and in accordance with this Article 2. In the event any Member (the "*Transferring Member*") desires to Dispose of any of such Member's Membership Interest in accordance with the preceding sentence, such Member shall, by written notice (the "*Offering Notice*") given to the Company and to each other Member, offer exclusively and irrevocably to sell all the Membership Interest such Member desires to Dispose of to the Company and the other Members. The notice shall state (a) a description of the Membership Interest desired to be Disposed of, and the amount of

2

the Sharing Ratio being offered for sale, (b) the price (the "Offering Price") and other terms upon which that Member desires to Dispose of the Membership Interest (provided that if there is no or only nominal consideration for the Disposition, the Offering Price shall be deemed to be the Fair Market Value (as hereinafter defined) of the Membership Interest determined in accordance with Section 2.09 herein), (c) the amount and nature of any liens or encumbrances against the interest, (d) whether that Member is in default under any provision in this Agreement, and if so, the nature of the default, (e) the address at which notice can be given, and (f) the name or names of the persons other than Members to whom the Membership Interest will be sold in the event neither the Company nor the Members elect to buy it. The Company and the Members shall exercise their options under this Section 2.04, if at all, within the time and in the manner provided in Sections 2.07 through 2.09 herein. If all the Membership Interest sought to be Disposed of under this Section 2.04 (or under Section 2.06 below) is not so purchased by the Company or the other Members, the Transferring Member may Dispose of the Membership Interest so offered for sale hereunder (but not less than all) to any person named in the Offering Notice given at the same price and upon the same terms as stated in the Offering Notice upon the unanimous written consent of the Executive Committee which may be withheld in the sole discretion of the Executive Committee, provided that if either (i) the Membership Interest has not been finally so disposed of within 45 days after the date on which the options hereunder expired, and that party still desires to Dispose of any of the Membership Interest, or (ii) that party wishes to Dispose of any of the Membership Interest at a price lower than, and/or on terms different than, and/or to a person different than, that stated in the Offering Notice, then in any such event, the Transferring Member must first offer the Membership Interest to the Company and the Members in the manner provided in this Article 2.

2.05    *Death or Expulsion of a Member.* In the event of the death of a Member or the expulsion of a Member from the Group pursuant to Section 2.15 of this Agreement, during a period of 180 days (unless the time period is suspended as provided in Section 2.09 herein) following the qualification of the personal representative of such deceased Member in the case of the death of a Member or 180 days following the expulsion of a Member, the Company and the other Members shall have an option (but not an obligation) to purchase all of the Membership Interest owned by such deceased or expelled Member at the time of such Member's death or expulsion at the Fair Market Value determined as of the last day of the calendar month preceding the date of the death or expulsion of such Member. The Company and the other Members shall exercise their options under this Section 2.05, if at all, within the foregoing 180-day period, in the manner provided in Sections 2.07 through 2.09 herein.

2.06.    *Encumbrance; Involuntary Disposition.* Any Disposition of a Membership Interest (a) pursuant to a pledge, mortgage, or other encumbrance of a Membership Interest granted by a Member to secure a debt or other obligation, (b) pursuant to a bankruptcy or insolvency proceeding of a Member, (c) pursuant to judicial order, legal process, execution, or attachment or (d) any other involuntary Disposition not otherwise provided for herein shall be subject to the restrictions set forth in this Agreement, and in any such event the party demanding the Disposition shall be required to effect such Disposition in accordance with the provisions of Section 2.04 as if such party were a Transferring Member (with the Offering Price to be the Fair Market Value of the Membership Interest determined in accordance with Section 2.09 herein), and in such case the Offering Notice shall specify an address of the party demanding the Disposition for notices and other communications hereunder.

2.07.    *Options to Company and Members.* The Company shall exercise its options under this Article 2, if at all, by giving written notice (a "Response Notice") to the Transferring Member or other transferor within the 30 days after receipt of the Offering Notice as to whether the Company elects to purchase all or any part of the Membership Interest sought to be disposed of. If the

3

114

Company does not elect to purchase all of such Membership Interest, the Company shall give to each of the other Members a copy of the Offering Notice and its Response Notice, and each of the other Members shall, within 30 days after the receipt of the Response Notice from the Company, give a Response Notice to the Company as to whether such Member elects to purchase any of such Membership Interest not to be purchased by the Company. The Company shall give a copy of that Response Notice to the Transferring Member or other transferor and each other Member who also gave an affirmative Response Notice. If more than one Member elects to purchase some of the Offered Membership Interest, it shall be allocated among the Members who desire to purchase it (the "Purchasing Members") in such proportions as they may agree upon, or in the absence of such agreement, pro rata according to the relative Sharing Ratios then held by the Purchasing Members.

2.08. *Payment of Purchase Price; Delivery of Instruments of Conveyance.* The Membership Interest which is elected to be purchased under this Article 2 shall be paid for at a closing, held on a business day not more than 30 days after the time for electing to purchase the interest lapses, all in cash or by cashier's check or on the other terms stated in the Offering Notice. At the closing, the selling party shall deliver instruments of conveyance and assignment of the appropriate amount of the Membership Interest purchased by the Company and/or the Purchasing Members and in proper form for transfer of all such interest, free and clear of all security interests, liens, claims, encumbrances and equities of every kind other than the mortgage indebtedness encumbering the Company's property; and the purchasers shall pay the purchase price and deliver any notes and security agreements required under the offer. The selling party shall pay all expenses and charges of the transfer of the interest, except that the parties shall pay their own attorneys' fees. Any Membership Interest Disposed of under this Article 2 shall remain subject to all the provisions of this Agreement.

The Company is authorized to deduct, or have deducted and withheld from the amounts due to the selling party at the closing the amount of any debt or other obligation (plus any interest due thereon) then due from the selling party.

2.09. *Price of Membership Interest.* The price of a Membership Interest under Section 2.04 shall be the Offering Price stated or determined in accordance with Section 2.04. For all other Dispositions, the price of a Membership Interest for purposes of this Article 2 shall be the fair market value (the "*Fair Market Value*") of such Membership Interest, as follows:

(a) Fair Market Value of any Membership Interest is the price on the date specified in the applicable section of this Article 2 on which that Membership Interest which is being offered by the seller would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts, including, without limitation, that membership is restricted to Authorized Persons.

(b) Except for a Disposition under Section 2.04 herein, when under any provision of this Article 2 an Offering Notice is required, the party submitting that Offering Notice shall state an opinion as to the Fair Market Value of the Membership Interest being so offered. If there is any dispute as to the Fair Market Value of any Membership Interest, that dispute shall be resolved pursuant to the dispute resolution procedures as set forth in Article 9 hereof. Upon the giving of notice by any party to all other parties to the Disposition of the Membership Interest as to the existence of that dispute, the time limits specified for Response Notices, Closings, and other notices required in this Agreement, shall be suspended until that dispute is resolved under the procedures outlined in Article 9.

(c) Notwithstanding anything herein to the contrary, Fair Market Value of any

4

Membership Interest shall be determined on the basis that no individual or entity owning that Membership Interest has the right to withdraw that Membership Interest from the Membership or cause the Membership to terminate and liquidate before the end of the term of the Company. Therefore, the Fair Market Value of any Membership Interest shall be determined under the assumption that the only distributions that will be made to the owner of that Membership Interest will be that Membership Interest's proportionate share of the cash distributions of the Membership which are distributed to the Members from time to time and that Membership Interest's proportionate share of the properties of the Membership when the Company terminates.

2.10. *Prerequisites to Becoming an Assignee or a Substituted Member.* No person not already a Member shall become a substituted Member without the prior unanimous written consent of the Executive Committee which may be withheld in the sole discretion of the Executive Committee, but the terms of this Article 2 shall apply to an assignee as if the assignee were a Member. No Disposition of all or any part of a Membership Interest shall be effective or binding upon the Members until the Members have received written notice thereof and all the provisions of this Agreement have been satisfied. If the transfer is to a person other than a person who is a Member before the transfer, then, as a condition to recognizing the transferee as an assignee, the Members shall have the right to require that any or all of the following requirements be satisfied: (a) the provision of evidence that the Disposition will not be or result in a violation of any federal, state or other governmental law or regulation; (b) the execution and delivery to the Members by the selling party and the transferee of all instruments which the Members deem reasonably necessary, in form satisfactory to the Members; (c) the payment in advance to the Company of any costs or expenses connected with the assignment or other disposition or assurances from the purchaser of such interest that those amounts will be paid at the time the sale is closed; (d) assurance that the person to whom the assignment or other disposition is to be made is willing and able to perform all of the selling party's obligations under this Agreement, is an Authorized Person, and is not incompetent. **Notwithstanding the satisfaction of the foregoing requirements, any Disposition of a Membership Interest shall be effective only to give the assignee the right to receive the share of profits to which the assignor would otherwise be entitled and shall not relieve such assignor from any liability or obligation under any provisions of this Agreement or give such assignee the right to become a substituted Member, unless and until such assignee is expressly admitted to the Company by the Executive Committee as provided above.** The Executive Committee may grant or withhold such admission in the sole discretion of the Executive Committee. Each Member understands and agrees that the requirements and restrictions contained in this Article 2 are reasonable and absolutely essential in order to assure that the purpose for which this Company is formed shall be carried out and to assure that no person will obtain an interest in the Company whose motives, intentions or objectives are inconsistent with those of the original Members.

2.11. *Creation of Additional Membership Interests.* Additional Membership Interests may be created and issued to existing Members or to other persons, provided that such person is an Authorized Person, and such other Persons may be admitted to the Company as Members, upon the unanimous written consent of the Executive Committee, on such terms and conditions, and with such Sharing Ratios, as the Executive Committee may determine at the time of admission, provided that as a condition precedent to the admission of a new Member to the Company, such new Member must execute a joinder agreement (in a form promulgated by the Executive Committee) to this Agreement agreeing to be bound by the terms and conditions of this Agreement. The Executive Committee may reflect the admission of any new Members or the creation of any new class or group of Members in an amendment to this Agreement that need be executed only by the Executive Committee. Each admitted Member shall be required to sign a counterpart to this Agreement or a joinder agreement, as determined by the Executive Committee, as a condition to admittance. **AS A**

5

116

CONDITION TO ADMITTANCE, EACH ADMITTED MEMBER, EXCEPT FOR THE FOUNDING MEMBERS, HEREBY AGREES THAT SUCH ADMITTED MEMBER SHALL BE A NON-VOTING MEMBER WITH NO VOTING RIGHTS HEREIN OR PURSUANT TO THE TBOC, AND SUCH ADMITTED MEMBER HEREBY WAIVES THE PROVISIONS OF THE TBOC THAT WOULD OTHERWISE GRANT SUCH MEMBER VOTING RIGHTS IN THE COMPANY, INCLUDING, WITHOUT LIMITATION, THOSE PROVISIONS IN SECTION 101.356 OF THE TBOC.

2.12. *Withdrawal.* Subject to the terms and conditions of Section 2.04, a Member does not have the right or power to withdraw from the Company until after the third anniversary of such Member's admittance into the Company.

2.13. *Information.* In addition to the other rights specifically set forth in this Agreement, each Member and each assignee is entitled to all information to which that Member or Assignee is entitled to have access pursuant to sections 3.153 and 101.502 of the TBOC under the circumstances and subject to the conditions therein stated.

2.14. *Liability to Third Parties.* No Member or Manager shall be liable for the debts, obligations, or liabilities of the Company, including under a judgment decree or order of a court.

2.15. *Expulsion.* A Founding Member may not be expelled from the Company, except for Cause (as hereinafter defined) as unanimously determined by the Executive Committee (excluding the Member being considered for expulsion). For purposes of this Agreement, the term "*Cause*" means (i) the gross negligence or willful misconduct of a Member as unanimously determined by the Executive Committee (excluding the Member being considered for expulsion), (ii) a breach by a Member of any of the covenants set forth in Section 2.16 or Article 10 of this Agreement as unanimously determined by the Executive Committee (excluding the Member being considered for expulsion) provided that such Member has been given written notice specifying in reasonable detail the nature of the breach and fails to cure such breach within thirty (30) days of receipt of such notice, (iii) in the event such Member's medical license with the state of Texas is revoked, suspended, terminated, lapsed, restricted, or relinquished or such Member is otherwise no longer duly qualified to provide medical services in the state of Texas, (iv) in the event a Member's right to practice medicine at the Hospital is suspended or revoked, or (v) in the event a Member is convicted of a felony or a criminal offense related to health care or otherwise. All other Members may be expelled from the Company with or without Cause as determined by Members entitled to vote owning sixty percent (60%) or more of the Voting Sharing Ratios.

2.16. *Confidentiality of Information.* Each Member is entitled to all information under the circumstances and subject to the conditions stated in this Agreement and the TBOC. The Members agree, however, that the Executive Committee may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, property, and financial condition of the Company shall be kept confidential and not provided to some or all other non-voting Members and that it is not just or reasonable for those non-voting Members or assignees or representatives to examine or copy that information. Each Member acknowledges that he may receive information regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the Company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any person other than another Member, except for disclosures (a) compelled by law (but the Member must notify the Executive Committee promptly of any request for that information before disclosing it, if practicable), (b) to advisers or representatives of the Member or assignees of the Member, but only if they have agreed to be bound by the provisions of

6

this section, or (c) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. The Members acknowledge that breach of the provisions of this section may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this section may be enforced by specific performance and by the expulsion of such Member from the Company.

2.17. *Member Requirements.* Each Member shall be required to provide medical services at the Hospital for a minimum of eight (8) shifts per each calendar month or as otherwise determined by the Executive Committee (the "*Minimum Monthly Commitment*"). If a Member is unable to meet the Minimum Monthly Commitment, then the Executive Committee shall have the right to adjust and pro-rate such Member's and the other Member's Sharing Ratio in the manner determined by the Executive Committee.

## Article 3
## Capital Contributions

3.01. *Initial Contributions.* Contemporaneously with the execution by such Member of this Agreement, each Member shall make the contributions to the capital of the Company ("*Capital Contributions*") described for that Member in **Exhibit A**.

3.02. *Subsequent Contributions.* No member shall be required to contribute additional capital to the Company.

3.03. *Return of Contributions.* A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its capital account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

3.04. *Advances by Members.* If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Executive Committee may advance all or part of the needed funds to or on behalf of the Company, at such interest rate and on such other terms as such Member and the Executive Committee may agree. An advance described in this Section 3.04 constitutes a loan from the Member to the Company and is not a Capital Contribution.

## Article 4
## Distributions and Allocations

4.01. *Distributions.* At such time as determined by the Executive Committee, Net Cash Flow (as defined in this Section 4.01) for each fiscal year (or such shorter period for which the distribution is made) shall be distributed to the Members in proportion to their Sharing Ratios. The term "Net Cash Flow" shall mean all cash funds derived by the Company (including interest received on reserves, borrowings, and capital transactions), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses (including, without limitation, salaries and/or other guaranteed payments), debt payments, capital improvements, replacements, and establish reasonable reserves for future expenses and costs as determined by the Executive Committee in its sole discretion.

4.02. *Distributions for Income Taxes.* Notwithstanding the provisions of Section 4.01, the

7

Executive Committee shall distribute sufficient cash or other liquid assets annually to the Members to enable such Members to pay any and all income taxes incurred by such Members that are attributable to the ownership of Membership Interests in the Company, except for those taxes related to a Member's salary or other compensation.

4.03    *Allocations of Profits and Losses.*

(a) *Generally.* Except as otherwise provided in this Article 4, each item of Company income, gain, loss, deduction and credit (including nontaxable losses described in section 705 of the United States Internal Revenue Code of 1986, as amended, [the "Code"]) shall be allocated among the Members in accordance with their respective Sharing Ratios. Notwithstanding the foregoing, to the extent allowed or required by the Code, the Treasury Regulations, or by generally accepted accounting principles, the Executive Committee may allocate items of Company income, gain, loss, deduction, and credit in any manner consistent with the requirements of the Code, Treasury Regulations, and generally accepted accounting principles. The allocation of particular items of income, gain, loss, deduction and credit are intended by the Members to have substantial economic effect in conformity with the Treasury Regulations. Any provision of this Agreement which conflicts with or fails of that intention shall be reconciled or amplified to the extent necessary to effect such intent.

(b) *Tax Allocations: Code Section 704(c).* The above notwithstanding, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its fair market value as required in accordance with Code § 704(c) and the Treasury Regulations relating thereto. In the event any decisions, allocations or elections are required or useful for the Company to comply with the provisions of Code § 704(c) and the Treasury Regulations relating thereto, the Executive Committee shall have the right to make such decisions, allocations or elections in their sole and absolute discretion.

4.04    *Special Allocations of Profits and Losses.*

(a) *Minimum Gain Chargeback.* The Company shall comply with the minimum gain chargeback requirement in Treasury Regulations section 1.704-2(f).

(b) *Chargeback of Minimum Gain Attributable to Member Nonrecourse Debt.* The Company shall comply with the minimum gain chargeback requirement in Treasury Regulations section 1.704-2(i)(4).

(c) *Qualified Income Offset.* The Company shall comply with the qualified income offset provisions in Treasury Regulations sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

(d) *Allocations Upon Transfer.* Upon transfer of any membership interest in the Company, unless agreed otherwise by the transferor and transferee with the written consent of the Executive Committee, the items of income and loss attributable to the Company Rights shall be apportioned between the assignor and the assignee as of the last of day of the month preceding the transfer (the deemed transfer date) based on the results of Company operations through that deemed transfer date.

8

# Article 5
## Management

5.01.  *Management by Managers.*

(a) Subject to the provisions of Section 5.02, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, managers of the Company ("*Managers*," the Managers collectively may also be referred to as the "*Executive Committee*"), including, without limitation, the following:

(i)  To pay, and to perform all ministerial acts and duties relating to the general management and operation of the day-to-day business of the Company, including without limitation, the payment of all indebtedness, taxes and assessments;

(ii)  To collect all monies due to the Company from the Members or other persons and to disburse Company funds to those persons entitled to receive them;

(iii)  To establish, maintain and supervise the deposits and withdrawals of funds of the Company in bank accounts for the ordinary purposes of the Company;

(iv)  To establish and set all salaries and compensation formulas for Members, employees and agents of the Company;

(v)  To attend to all staff employee matters, including without limitation, the hiring and firing of staff employees;

(vi)  To employ attorneys to provide legal counsel to the Company, including but not limited to those legal expenses in connection with formation, organization, and operation of the Company and all legal expenses in connection with the Company's agreement and arrangements directly or indirectly related to the Hospital, and to employ accountants to prepare income tax returns, financial statements and reports which shall be furnished to the Members;

(vii)  To purchase any and all insurance deemed necessary by the Executive Committee for any and all Company purposes, including, without limitation, general liability insurance, professional malpractice insurance, and to provide protection with respect to the Company and claims of third parties and to pay the premiums from the funds of the Company;

(viii)  To conduct the administrative affairs of the Company, including without limitation the taking of action necessary to carry out any vote, decisions made and action taken by the Members hereunder;

(ix)  Upon the approval of the Members entitled to vote owning seventy five percent (75%) or more of the Voting Sharing Ratios, to sell, assign, transfer, convey, encumber, pledge, lease, rent, or otherwise dispose of, and to negotiate with respect thereto, the assets of the Company; and

(x)  To perform all other duties and obligations, and to exercise all other powers and rights, provided elsewhere to be performed and exercised by the Managers.

9

120

In addition to the management of the Company, the Executive Committee shall have the purpose of promoting the cohesion, common goals, success, and protection of the interests of the Group.

(b)      In managing the business and affairs of the Company and exercising its powers, the Executive Committee shall act (i) collectively through resolutions adopted at meetings and in written consents pursuant to Sections 5.04 and 5.06; and (ii) through committees and individual Managers to which authorities and duties have been delegated pursuant to Section 5.05. No Manager has the right, power, or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company, except in accordance with the immediately preceding sentence. Decisions or actions taken by the Executive Committee in accordance with this Agreement (including this Section 5.01 and Section 5.02) shall constitute decisions or actions by the Company and shall be binding on each Manager, Member, Officer (as defined in Section 5.09), and employee of the Company.

5.02.    *Member's Right to Bind; Decisions Requiring Member Consent.* No Member in its capacity as a Member has the right, power, or authority to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditure on behalf of the Company. Notwithstanding any power or authority granted the Managers under the TBOC, the Certificate, or this Agreement, the Managers may not make any decision or take any action for which the consent of the Members entitled to vote is required by the Certificate or this Agreement, without first such obtaining such consent. Each Member entitled to vote may, with respect to any vote, consent, or approval that it is entitled to grant pursuant to this Agreement, grant or withhold such vote, consent, or approval in its sole discretion.

5.03    *Selection of Managers.* The number of Managers of the Company shall equal the number of Founding Members who remain Members of the Company, or as otherwise agreed upon by a vote of the Members entitled to vote holding at least seventy-five percent (75%) of the Voting Sharing Ratios. The initial Managers of the Company shall be the Managers named in the Certificate, who shall be the "*Authorized Managers*" to act for the Company until their successors are elected by the Members. Managers must be Members of the Company. Each Manager (whether an initial or a successor Manager) shall cease to be a Manager upon the earliest to occur of the following events: (a) such Manager shall engage in gross negligence or willful misconduct in the performance of his or her duties as a Manager and, as a result thereof, shall be removed by the unanimous vote of the Members entitled to vote (excluding the Member accused of engaging in gross negligence of willful misconduct); (b) such Manager shall resign as a Manager, by giving notice of such resignation to the Members; (c) such Manager shall die or become permanently disabled; or (d) such Manager shall no longer be a Member of the Company. Any vacancy in any Manager position not otherwise filled as provided above may be filled by a vote of a majority interest (by number) of the remaining Managers at a meeting of the Executive Committee called for that purpose.

5.04.    *Meetings of the Executive Committee.* Regular meetings of the Executive Committee may be held on such dates and at such times as shall be determined by the Executive Committee, with notice of the establishment of such regular meeting schedule being given to each Manager that was not present at the meeting at which it was adopted. Special meetings of the Executive Committee may be called by any Manager by notice thereof (specifying the place and time of such meeting) that is delivered to each other Manager at least 24 hours prior to such meeting. Neither the business to be transacted at, nor the purpose of, such special meeting need be specified in the notice (or waiver of notice) thereof. Unless otherwise expressly provided in this Agreement, at any meeting of the Executive Committee, a majority (by number) of the Executive Committee shall

10

constitute a quorum for the transaction of business, and an act of a majority (by number) of the Executive Committee who are present at such a meeting at which a quorum is present shall be the act of the Executive Committee. The provisions of this Section 5.04 shall be inapplicable at any time that there is only one Manager.

5.05. *Committees of Executive Committee; Delegation of Authority to Individual Managers.* The Executive Committee may designate one or more committees, each of which shall be comprised of one or more of the Managers, and may designate one or more of the Managers as alternate members of any committee. Except for matters that are imposed on Managers by law pursuant to the TBOC and cannot be delegated to such a committee, any such committee, to the extent provided in the resolution establishing it, shall have and may exercise all of the authority that may be exercised by the Executive Committee. Regular and special meetings of such committee shall be held in the manner designated by the Executive Committee or, if not so designated, by such committee. The Executive Committee may dissolve any committee at any time. In addition, the Executive Committee may delegate to one or more Managers such authority and duties, and assign to them such titles, as the Executive Committee may deem advisable. Any such delegation may be revoked at any time by the Executive Committee.

(a)    *Director and Assistant Director.* The Executive Committee shall appoint a Director and an Assistant Director, each of who must also be a Manager, and who shall report to the Executive Committee and who shall be responsible for the day-to-day management of the Company and have all other responsibilities as the Executive Committee shall delegate. The Director and Assistant Director shall serve for a one (1) year term and shall be annually reviewed by the Executive Committee. The Director and Assistant Director are not authorized to act or make decisions on behalf of the Executive Committee without the prior written approval of the Executive Committee. In the event that either the Director or the Assistant Director (or both) act or make a decision in contravention of the Executive Committee, then such decision shall be null, void, or unenforceable.

(b)    *Budget.* The Executive Committee shall establish a "Directorship" budget for use by the Director, of which 50% shall be allocated for use by the Assistant Director. Each of the Director and Assistant Director shall be required to use commercially reasonable efforts to maintain such budget, to track all expenses and expenditures, and to report to the Executive Committee all extraordinary expense or expenditures. The Executive Committee shall have the right to review and adjust such budget at any time, from time to time, for the benefit and interest of the Company.

5.06. *Compensation.* The Managers, Director, and Assistant Director shall receive such reasonable compensation, if any, for their services as may be designated by the unanimous written consent of the Executive Committee. In addition, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including but not limited to those services rendered under Section 5.01.

5.07. *Meetings of Members.* An annual meeting of the Members for the transaction of such business as may properly come before the meeting shall be held on such date and at such time as the Executive Committee shall specify in the notice of the meeting, which shall be delivered to each Member at least 20 days prior to such meeting. Special meetings of the Members may be called by the Executive Committee or by Members having among them at least ten percent of the Sharing Ratios of all Members. Any such meeting shall be held on such date and at such time as the Person calling such meeting shall specify in the notice of the meeting, which shall be delivered to each Member at least ten days prior to such meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) for such meeting may be conducted at such meeting.

11

Unless otherwise expressly provided in this Agreement, at any meeting of the Members, Members entitled to vote holding among them at least a majority of all Voting Sharing Ratios (a "*Majority Interest*"), represented either in person or by proxy, shall constitute a quorum for the transaction of business, and an act of a Majority Interest shall be the act of the Members, it being understood that all Members, including non-voting Members may attend all meetings of the Members.

5.08. *Provisions Applicable to All Meetings.* In connection with any meeting of the Executive Committee, Members, or any committee of the Executive Committee, the following provisions shall apply:

(a) *Place of Meeting.* Any such meeting shall be held at the principal place of business of the Company, unless the notice of such meeting (or resolution of the Executive Committee or committee, as applicable) specifies a different place, which need not be in the State of Texas.

(b) *Waiver of Notice Through Attendance.* Attendance of a Person at such meeting (including pursuant to Section 5.08(e)) shall constitute a waiver of notice of such meeting, except where such Person attends the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

(c) *Proxies.* A Person may vote at such meeting by a written proxy executed by that Person and delivered to another Manager, Member, or member of the committee, as applicable. A proxy shall be revocable unless it is stated to be irrevocable.

(d) *Action by Written Consent.* Any action required or permitted to be taken at such a meeting may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Managers, Members, or members of the committee, as applicable, having not fewer than the minimum number of Voting Sharing Ratios or votes that would be necessary to take the action at a meeting at which all Members, Managers, or members of the committee, as applicable, entitled to vote on the action were present and voted.

(e) *Meetings by Telephone.* Managers, Members, or members of the committee, as applicable, may participate in and hold such meeting by means of conference telephone, videoconference, or similar communications equipment by means of which all Persons participating in the meeting can hear each other.

5.09. *Officers.* The Executive Committee may designate one or more Member(s) to be officers of the Company ("*Officers*"), provided such Officer remains a Member of the Company and a professional individual, as such term is defined in Section 301.003(5) of the TBOC, and any Officers so designated shall have such title, authorities, duties, and salaries as the Executive Committee may delegate to them. Any Officer may be removed as such, either with or without cause, by the Executive Committee.

5.10. *Limitations on Liability of Managers.* The liability of the Managers to the Company and the Members shall be limited to the extent, if any, set forth in the Certificate and as provided by the TBOC.

5.11. *Conflicts of Interest.* Subject to the other express provisions of this Agreement, each Member, Manager, Officer, or affiliate thereof may engage in and possess interests in other business ventures of any and every type and description, independently or with others, except for ones in competition with the Company or ones in connection with the practice of medicine, with no

12

obligation to offer to the Company or any other Member, Manager, or Officer the right to participate therein. The Company may transact business with any Member, Manager, Officer, or Affiliate thereof, provided the terms of those transactions are no less favorable than those the Company could obtain from unrelated third parties.

5.12. *Indemnification.*

(a) Each Member shall indemnify, defend, protect and hold harmless the Company, and each other Member from and against all actions, suits or proceedings, and all other claims, demands, losses, damages, liabilities, judgments, awards, penalties, fines, settlements, costs and expenses (including court costs and reasonable attorneys' fees), arising out of or related to the professional malfeasance or malpractice of such Member.

(b) The Company shall indemnify, defend, protect and hold harmless each Manager from and against all actions, suits or proceedings, and all other claims, demands, losses, damages, liabilities, judgments, awards, penalties, fines, settlements, costs and expenses (including court costs and reasonable attorneys' fees), arising out of the management of the Company or such Manager's service or status as a Manager. **THIS INDEMNITY SHALL APPLY TO MATTERS THAT ARISE OUT OF THE NEGLIGENCE, STRICT LIABILITY OR OTHER FAULT OR RESPONSIBILITY BY SUCH MANAGER; PROVIDED, HOWEVER, THAT THIS INDEMNITY SHALL NOT APPLY TO MATTERS ARISING OUT OF THE GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR BREACH OF THIS AGREEMENT BY SUCH MANAGER.** The Company, by adoption of a resolution of the Executive Committee, may indemnify an Officer, employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify Managers under the proceeding sentence. The Company may purchase and maintain insurance to protect itself and any Manager, Officer, employee or agent of the Company.

## Article 6
## Taxes

6.01. *Tax Returns.* The Company shall prepare and timely file all federal, state, and local tax returns required to be filed by the Company. Each Member shall furnish to the Company all pertinent information in its possession relating to the Company's operations that is necessary to enable the Company's tax returns to be timely prepared and filed. The Company shall deliver a copy of each such return to the Members on or before ten days prior to the due date of any such return, together with such additional information as may be required by the Members in order for the Members to file their individual returns reflecting the Company's operations. The Company shall bear the costs of the preparation and filing of its returns.

6.02. *Tax Elections.* The Company shall make the following elections on the appropriate tax returns:

(a)     to adopt the calendar year as the Company's fiscal year;

(b)     to adopt the cash or accrual method of accounting as determined by the Manager, and to keep the Company's books and records on the income-tax method;

(c)     if a distribution of the Company's property as described in Code section 734 occurs or upon a transfer of Membership Interests as described in Code section 743 occurs, on request by notice from any Member, to elect, pursuant to Code section 754, to adjust the basis of Company's properties;

13

(d)     to elect to deduct and amortize the organizational expenses of the Company as permitted by Code section 709; and

(e)     any other election the Executive Committee may deem appropriate and in the best interests of the Members.

So long as the Company has two (2) or more Members, neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law and no provision of this Agreement (including Section 1.07) shall be construed to sanction or approve such an election.

6.03.    *Tax Matters Member.* The Executive Committee shall designate one Manager that is a Member to be the "tax matters partner" of the Company pursuant to Code section 6231(a)(7) (the "*Tax Matters Member*"). The sole Member is hereby designated as the initial Tax Matters Member. The Tax Matters Member shall take such action as may be necessary to cause to the extent possible each other Member to become a "notice partner" within the meaning of Code section 6223. The Tax Matters Member shall inform each other Member of all significant matters that may come to its attention in its capacity as Tax Matters Member by giving notice thereof on or before the fifth business day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. The Tax Matters Member shall take no action without the authorization of a Majority Interest, other than such action as may be required by applicable law. Any cost or expense incurred by the Tax Matters Member in connection with its duties, including the preparation for or pursuance of administrative or judicial proceedings, shall be paid by the Company.

### Article 7
### Books, Records, and Bank Accounts

7.01.    *Books and Records.* The Executive Committee shall keep or cause to be kept at the principal office of the Company complete and accurate books and records of the Company, supporting documentation of the transactions with respect to the conduct of the Company's business, and minutes of the proceedings of its Executive Committee, Members, and each committee of the Executive Committee. The books and records shall be maintained with respect to accounting matters in accordance with sound accounting practices, and all books and records shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

7.02.    *Reports.* Within seventy-five days after the end of each taxable year, the Executive Committee shall cause to be sent to each Member at the end of the taxable year a complete accounting of the financial affairs of the Company for the taxable year then ended.

7.03.    *Accounts.* The Executive Committee shall establish one or more separate bank and investment accounts and arrangements for the Company, which shall be maintained in the Company's name with financial institutions and firms that the Executive Committee determines.

14

# Article 8
## Winding Up and Termination

8.01. *Events Requiring Winding Up and Termination.*

(a) Subject to Section 8.01(b), the Company shall wind up its affairs on the first to occur of the following events:

(i) the expiration of the period fixed for the duration of the Company in the Certificate;

(ii) the consent of all of the Members; and

(iii) entry of a decree of judicial termination of the Company under section 11.301 of the TBOC.

No other event (including, without limitation, any event that terminates the continued membership of the last remaining member of the limited liability company) will cause the Company to be wound up and terminated.

(b) If an event described in subparagraph (i) of Section 8.01(a) shall occur and there shall be at least one Member remaining, the Company shall not be wound up or terminated, and the business of the Company shall be continued, if a Majority Interest so agrees within 90 days of the occurrence of such event. If such election is made following the occurrence of an event described in subparagraph (i) of Section 8.01(a), the Executive Committee shall promptly amend the Certificate in the manner described in section 3.051 of the TBOC.

8.02. *Winding Up and Termination.*

(a) On the occurrence of an event described in Section 8.01(a), unless an election is made to continue the business of the Company pursuant to Section 8.01(b), the Executive Committee shall act as liquidator or may appoint one or more Members as liquidator. The liquidator shall proceed diligently to wind up the affairs of the Company as provided in the TBOC. Until final distribution, the liquidator shall continue to operate the Company properties with all of the power and authority of the Executive Committee. The costs of winding up shall be borne as a Company expense.

(b) Any assets of the Company remaining at the conclusion of the winding-up process shall be distributed among the Members in accordance with their Sharing Ratios. All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination. The distribution of cash and/or property to a Member in accordance with the provisions of this Section 8.02(b) constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Interest and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of section 101.154 of the TBOC.

(c) On completion of such final distribution, the Executive Committee shall file a Certificate of Termination with the Secretary of State of Texas, cancel any other filings made pursuant to Section 1.05, and take such other actions as may be necessary to terminate the existence of the Company.

014096-091_20051-3

8.03. *No Restoration of Deficit Capital Accounts.* No Member shall be required to pay to the Company, to any other Member or to any third party any deficit balance that may exist from time to time in any capital or similar account maintained for such Member for any purpose.

## Article 9
## Dispute Resolution

The Members have entered into this Agreement in good faith and in the belief that it is mutually advantageous to them. It is with that same spirit of cooperation that they pledge to attempt to resolve any dispute amicably without the necessity of litigation. Accordingly, they agree if any dispute arises between them relating to this Agreement (the "Dispute"), they will first utilize the procedures specified in this Article 9 (the "Procedure").

9.01    *Arbitration of Fair Market Value of Membership Interest.* For the resolution of any Dispute as to the Fair Market Value of any offered Membership Interest under this Agreement, the following Procedure shall apply:

(a)    In order to resolve any Dispute as to the Fair Market Value of any offered Membership Interest under this Agreement (the "*Disputed Membership Interest*"), the seller of the Disputed Membership Interest shall appoint a single appraiser, and the purchaser or purchasers of the Disputed Membership Interest shall agree upon and appoint a single appraiser. The two appraisers so appointed by the parties to the Dispute shall appoint a common appraiser. Each appraiser other than the common appraiser shall give an opinion on the Fair Market Value of the Disputed Membership Interest. The controlling opinion shall be that opinion chosen by the common appraiser who shall choose between the opinions of the other two appraisers. Only appraisers who are qualified and independent may be appointed. For purposes hereof, an appraiser shall be "qualified" if the appraiser would be considered an expert for purposes of giving testimony as to the Fair Market Value of the Disputed Membership Interest in a judicial or similar proceeding. An appraiser shall be considered "independent" if the appraiser does not directly or indirectly own any Membership Interest in the Company and is not directly or indirectly in control of, controlled by, or under common control with the Company or any Member of the Company. If the parties who are the purchasers of the Disputed Membership Interest cannot agree on the identity of their designated appraiser, that disagreement shall be submitted to arbitration under procedures outlined in paragraph (b) below. If the appraisers chosen by the seller and the purchasers of the Disputed Membership Interest cannot agree on whom the common appraiser shall be, that Dispute shall be submitted to arbitration under procedures outlined in paragraph (c) below. All parties shall make all reasonable efforts to forthwith perform the actions contemplated by this Article 9, and all of those parties shall perform those actions recognizing that time is of the essence. After the determination has been made by the common appraiser as to which opinion is the controlling opinion, all time limits specified for Response Notices, Closings and other notices under this Agreement shall no longer be suspended.

(b)    A purchaser wishing to submit the matter of determining the purchasers' appraiser to arbitration as permitted by paragraph (a) shall do so by giving written notice of arbitration to the other purchasers and shall also simultaneously file duplicate copies of the notice of arbitration with the regional office of the American Arbitration Association ("*AAA*") for Houston, Texas, together with the appropriate fee as provided in the AAA's administrative fee schedule. All communications with the AAA regarding the arbitration proceedings shall be directed to such regional office unless the AAA directs otherwise. The notice of that determination shall contain a brief description of the nature of the Dispute and the remedy or resolution sought by the purchaser initiating this procedure. Each of the other purchasers shall, within 20 days from the date of mailing of that notice, file with the

16

purchasers and the AAA a response which states such purchaser's view regarding that Dispute and the desired remedy or resolution. As soon as practical after the expiration of the 20-day period beginning upon the date of mailing of that notice, the AAA shall compile a list of available individuals or entities who could serve as an appraiser, equal to the number of purchasers plus one, competent and qualified to be an appraiser as described in the notice of arbitration and the responses thereto. The AAA shall also, at the same time, rank the appraisers in order first through that number equal to the number of purchasers plus one and shall thereupon forthwith transmit the list simultaneously to the purchasers and inform them of the order in which they have been ranked. Unless the purchasers shall beforehand agree to a different time or place, or both, they shall meet at the principal office of the Company at 10:00 a.m., Houston, Texas time, on the seventh weekday (Saturday, Sunday and holidays excluded) after the date of mailing of the AAA's list of appraisers and notice of ranking. At such time, the purchasers shall each, in accordance with the ranking determined by the AAA, strike one (1) name from the list submitted by the AAA. The highest ranking individual or entity whose name remains on the list upon completion of such striking shall be the appraiser for the purchasers. If the appraiser so selected declines or for any reason fails to serve, this procedure shall be repeated until an appraiser who is willing and able to serve has been selected. If any purchaser at any point fails to participate in the procedure hereinabove established to select appraisers, the AAA shall forthwith eliminate a name from the list of appraisers for the purchaser not so participating.

(c)     An appraiser wishing to submit the matter of determining the common appraiser as permitted by paragraph (a) of this Section 9.01 shall do so by giving written notice of arbitration to the other appraiser and shall also simultaneously file duplicate copies of the notice of arbitration with the regional office of the AAA for Houston, Texas, together with the appropriate fee as provided in the AAA's administrative fee schedule. All communications with the AAA regarding the proceedings shall be directed to such regional office unless the AAA directs otherwise. The notice of that determination shall contain a brief description of the nature of the Dispute and the remedy or resolution sought by the appraiser initiating this procedure. The other appraiser shall, within 20 days from the date of mailing of that notice, file with the originating appraiser and the AAA a response which states such appraiser's view regarding the Dispute and the desired remedy or resolution. As soon as practical after the expiration of the 20-day period beginning upon the date of mailing of the notice of arbitration, the AAA shall compile a list of three available individuals or entities competent and qualified to be a common appraiser as described in the notice of arbitration and the responses thereto. The AAA shall also, at the same time, rank those individuals or entities in order, first through third, and shall thereupon forthwith transmit the list simultaneously to the appraisers and inform them of the order in which they have been ranked. Unless the appraisers shall beforehand agree to a different time or place, or both, they shall meet at the principal office of the Company at 10:00 a.m., Houston, Texas time, on the seventh weekday (Saturday, Sunday and holidays excluded) after the date of mailing of the AAA's list of individuals and entities who could serve as a common appraiser and notice of ranking. At such time, the appraisers shall each, in accordance with the ranking determined by the AAA, strike a name from the list submitted by the AAA. The highest ranking individual or entity whose name remains on the list upon completion of such striking shall be the common appraiser. If the common appraiser so selected declines or for any reason fails to serve, this procedure shall be repeated until an individual or entity who is willing and able to serve as a common appraiser has been selected. If any appraiser at any point fails to participate in the procedure hereinabove established to select the common appraiser, the AAA shall submit two individuals or entities who could serve as the common appraiser for the appraiser who is participating to choose from.

9.02    *Resolution of Other Disputes Under This Agreement.* For the resolution of any Dispute under this Agreement which is not otherwise resolved pursuant to other procedures under

17

128

Section 9.01 above, the following procedure shall apply:

(a)    The Member seeking to initiate the Procedure (the "*Initiating Member*") shall give written notice to the other Members, describing in general terms the nature of the Dispute, the Initiating Member's claim for relief and identifying one or more individuals with authority to settle the Dispute on such Member's behalf.    The Member(s) receiving such notice (the "*Responding Member*,") whether one or more) shall have five (5) business days within which to designate, by written notice to the Initiating Member, one or more individuals with authority to settle the Dispute on such Member's behalf.    The individuals so designated shall be known as the "*Authorized Individuals*."  The Responding Member may authorize himself as an Authorized Individual.  The Initiating Member and the Responding Member shall collectively be referred as the "*Disputing Members*" or individually "*Disputing Member*."

(b)    The Authorized Individuals shall be entitled to make such investigation of the Dispute as they deem appropriate, but agree to promptly, and in no event later than 30 days from the date of the Initiating Member's written notice, meet to discuss resolution of the Dispute.  The Authorized Individuals shall meet at such times and places and with such frequency as they may agree.  If the Dispute has not been resolved within 30 days from the date of their initial meeting, the Disputing Members shall cease direct negotiations and shall submit the Dispute to mediation in accordance with the following procedure:

(1)    The Authorized Individuals will have five (5) business days from the date they cease direct negotiations to agree in writing on a mutually acceptable mediator.  If they fail to so agree, then within an additional five (5) business days, they shall submit to each other a written list of acceptable qualified attorney-mediators not affiliated with any of the Members, ranked in numerical order of preference.  If one or more names are on both lists, the highest ranking person shall be designated as the mediator.  If no mediator has been selected under this procedure, the Disputing Members agree jointly to request a State or Federal District Judge of their choosing (or if they cannot agree, the Local Administrative Judge for the county in which the principal office of the Company is located) to supply within 10 business days a list of potential qualified attorney-mediators.  Within five (5) business days of receipt of the list, the Authorized Individuals shall again rank the proposed mediators in numerical order of preference and shall simultaneously exchange such list and shall select as the mediator the individual receiving the highest combined ranking.  If such mediator is not available to serve, they shall proceed to contact the mediator who was next highest in ranking until they are able to select a mediator.

(2)    In consultation with the mediator selected, the Authorized Individuals shall promptly designate a mutually convenient time and place for the mediation, and unless circumstances require otherwise, such time to be not later than 45 days after selection of the mediator.

(3)    In the event any Disputing Member to this Agreement has substantial need for information in the possession of another Disputing Member to this Agreement in order to prepare for the mediation, all Disputing Members shall attempt in good faith to agree to procedures for the expeditious exchange of such information, with the help of the mediator if required.

(4)    At least seven (7) days prior to the first scheduled session of the

18

mediation, each Disputing Member shall deliver to the mediator and to the other Disputing Members a concise written summary of its views on the matter in Dispute and such other matters required by the mediator. The mediator may also request that a confidential issue paper be submitted by each Disputing Member to him.

(5) In the mediation, each Disputing Member may be represented by an Authorized Individual and may be represented by counsel. In addition, each Disputing Member may, with permission of the mediator, bring such additional persons as needed to respond to questions, contribute information, and participate in the negotiations.

(6) The mediator shall determine the format for the meetings, designed to assure that both the mediator and the Authorized Individuals have an opportunity to hear an oral presentation of each Disputing Member's views on the matter in dispute and that the authorized parties attempt to negotiate a resolution of the matter in dispute, with or without the assistance of counsel or others, but with the assistance of the mediator. To this end, the mediator is authorized to conduct both joint meetings and separate private caucuses with the disputing Members. The mediation session shall be private. The mediator will keep confidential all information learned in private caucus with any Disputing Member unless specifically authorized by such Disputing Member to make disclosure of the information to the other Disputing Member. The Disputing Members agree to sign a document agreeing that the mediator shall be governed by the provisions of Chapter 154 of the Tex. Civ. Prac. & Rem. Code and such other rules as the mediator shall prescribe. The Disputing Members commit to participate in the proceedings in good faith with the intention of resolving the Dispute if at all possible.

(7) The Disputing Members agree to participate in the mediation procedure to its conclusion. The mediation shall be terminated (i) by the execution of a settlement agreement by the Disputing Members, (ii) by a declaration of the mediator that the mediation is terminated, or (iii) by a written declaration of a Disputing Member to the effect that the mediation process is terminated at the conclusion of one full day's mediation session. Even if the mediation is terminated without a resolution of the Dispute, the Disputing Members agree not to terminate negotiations and not to commence any additional proceedings prior to the expiration of five (5) days following the mediation. Notwithstanding the foregoing, any Disputing Member may commence additional proceedings within such five (5) day period if the Dispute could be barred by an applicable statute of limitations.

(8) The fees and expenses of the mediator shall be shared equally by the Disputing Members. The mediator shall be disqualified as a witness, consultant, expert or counsel for any Disputing Member with respect to the Dispute and any related matters.

(9) Mediation is a compromise negotiation for purposes of Federal and State Rules of Evidence and constitutes privileged communication under Texas law. The entire mediation process is confidential, and no stenographic, visual or audio record shall be made. All conduct, statements, promises, offers, views and opinions, whether oral or written, made in the course of the mediation by any Disputing Member, their agents, employees, representatives or other invitees and by the mediator are confidential and shall, in addition and where appropriate, be deemed

014596-001_20051-3

privileged. Such conduct, statements, promises, offers, views and opinions shall not be discoverable or admissible for any purpose, including impeachment, in any litigation or other proceeding involving the parties, and shall not be disclosed to anyone not an agent, employee, expert, witness, or representative of any of the Members; provided, however, that evidence otherwise discoverable or admissible is not excluded from discovery or admission as a result of its use in the mediation.

(c)     If the Disputing Members are not successful in resolving the Dispute through the mediation, then the Disputing Members agree that the Dispute shall be settled by arbitration as follows:

Any party may submit the Dispute to arbitration and shall do so by giving written notice of arbitration to the other parties to the Dispute and shall also simultaneously file duplicate copies of the notice of arbitration with the regional office of AAA for Houston, Texas, together with the appropriate fee as provided in the AAA's administrative fee schedule. All communications with the AAA regarding the arbitration proceedings shall be directed to such regional office unless the AAA directs otherwise. The notice of arbitration shall contain a brief description of the nature of the Dispute to be arbitrated and the remedy or resolution sought by the party initiating arbitration. Each of the Disputing Members shall, within 20 days from the date of mailing of that notice of arbitration, file with the parties and the AAA a response which states such party's review regarding that Dispute to be arbitrated and the desired remedy or resolution. As soon as practicable after the expiration of the 20 day period beginning upon the date of mailing of that notice of arbitration, the AAA shall compile a list of available arbitrators, equal to the number of Disputing Members plus one, competent and qualified to be an arbitrator as described in the notice of arbitration and the responses thereto. The AAA shall also, at the same time, rank the arbitrators in order first through that number equal to the number of parties subject to the Dispute plus one and shall thereupon forthwith transmit the list simultaneously to the parties and inform them of the order in which they have been ranked. Unless the parties shall beforehand agree to a different time or place, or both, they shall meet at the principal office of the Company at 10:00 a.m., Houston, Texas time, on the seventh weekday (Saturday, Sunday and holidays excluded) after the date of mailing of the AAA's list of arbitrators and notice of ranking. At such time, each party to the Dispute shall each, in accordance with the ranking determined by the AAA, strike one (1) name from the list submitted by the AAA. The highest ranking individual or entity whose name remains on the list upon completion of such striking shall be the arbitrator for the parties. If the arbitrator so selected declines or for any reason fails to serve, this procedure shall be repeated until an arbitrator who is willing and able to serve has been selected. If any party to the Dispute at any point fails to participate in the procedure hereinabove established to select arbitrators, the AAA shall forthwith eliminate a name from the list of arbitrators for the party not so participating.

9.03    *Arbitration Generally.* Any arbitration under this Article 9 shall be held in Houston, Texas, at a location determined by the AAA. Except as otherwise specifically provided herein, all arbitration proceedings under this Article 9 shall be conducted in accordance with the Commercial Arbitration Rules of the AAA, as then amended and in effect; and such rules shall be interpreted and applied and questions regarding the arbitration process not resolved under such rules shall be determined in accordance with Texas law. Except as limited above, the parties agree that any determination under the Procedure of this Article 9 may be enforced or preserved by any court of competent jurisdiction. In the event a proceeding under this Article 9 is commenced, or other legal proceeding is commenced to enforce or preserve the rights awarded, the party who prevails or substantially prevails in such proceeding shall be entitled to recover from the other party or parties in such proceeding all costs, expenses and reasonable attorneys' fees incurred in connection with the proceeding and on appeal.

014896-001_20081-3

## Article 10
## Non-Competition; Non-Solicitation

10.01. *Covenant Not to Compete.* Each Member recognizes that (i) the other Members' entering into this Agreement is induced primarily because of the covenants and assurances made by such Member hereunder; (ii) such Member's covenant not to compete is necessary to ensure the continuation of the Company; and (iii) irreparable harm and damage will be done to the Company and the other Members in the event that such Member competes with the Company within the area or areas specified in this Article 10. Therefore, in consideration of these premises, the payment by the Company for any compensation or distribution in accordance with this Agreement, and as an inducement for the other Members to enter into this Agreement and consummate the transactions contemplated herein, each Member hereby agrees that while such Member is a Member of the Company and for a period of three (3) years following the date that a Member ceases to be a Member (for any reason whatsoever other than without Cause) (the *"Restrictive Period"*), such Member will not, directly or indirectly, in any capacity, own, manage, operate, control, participate in the management or control of, be employed by, consult with, lend such Member's name to, receive any remuneration from, or maintain or continue any interest whatsoever in any hospital, specialty hospital, or any other healthcare provider or in any medical practice (however organized) (the *"Restricted Activity"*), which is located within a _____ (___) mile radius of the Hospital (the *"Restricted Area"*); provided, however, that nothing contained in this Article 10 shall prohibit such Member from providing continuing care and treatment to a specific patient or patients during the course of an acute illness even after such Member's Membership Interest in the Company has terminated, if such patient asks such Member to continue such care and treatment through the course of their acute illness. This is to confirm that the foregoing restriction will prevent such Member from having an office in the Restricted Area during the Restrictive Period, other than an office provided by the Company.

10.02 *Medical Records.* Nothing in this Article 10 shall prevent or limit, or be construed to prevent or limit, a Member's reasonable access to the medical records of the patients such Member treated at the Hospital, to the extent required by and in accordance with applicable state and federal laws and the Hospital's policies, and the Company and/or Hospital shall, upon the written request of the patient, provide the treating Member with copies of such medical records for no more than the charges set forth by the Texas State Board of Medical Examiners.

10.03 *Solicitation of Employees.* Each Member further recognizes that (i) each other Members' entering into this Agreement is induced primarily because of the covenants and assurances made by each other Member hereunder; (ii) the covenant by each Member not to solicit employees related to the Company's medical practice is necessary in the event that such Member is no longer employed by the Company pursuant to this Agreement to ensure the continuation of the Company's business in respect of its medical practice; and (iii) irreparable harm and damage will be done to the Company's business with respect to its medical practice in the event that such Member competes with the Company in the solicitation of employees. Therefore, in consideration of these premises, the payment by the Company for any compensation or distribution in accordance with this Agreement, and as an inducement for the other Members' to enter into this Agreement and consummate the transactions contemplated herein, each Member agrees that for during the Restrictive Period, such Member will not, directly or indirectly, in any capacity, solicit for employment or employ any person who has been an employee of the Company. The Executive Committee in its sole discretion, may waive any or all of the provisions of this Article 10.

10.04 *Enforceability.* Each Member and the Company recognize and agree that the

21

132

covenants described in this Article 10 are ancillary to an otherwise enforceable agreement, that the duration, scope and geographic area applicable to the covenant described in this Article 10 are fair, reasonable, and necessary, that adequate compensation is to be received by such Member in accordance with this Agreement for such obligations, that these obligations do not prevent such Member from earning a livelihood, and that enforcement of the covenants described in this Article 10 is necessary to prevent irreparable harm and damage to the Company's business. In addition, each Member hereby acknowledges and agrees that this Article 10 is subject to Texas Business and Commerce Code §15.50, and each Member agrees that this Article 10 satisfies the requirements of such statute. If, however, for any reason, any court of competent jurisdiction determines that the restrictions in this Article 10 are not reasonable, that the consideration is inadequate, that such Member has been prevented from earning a livelihood, or that this Article 10 does not meet the requirements of Texas Business and Commerce Code §15.50, such restrictions shall be interpreted, modified, or rewritten to include as much of the duration, scope, and geographic area identified in this Article 10 as will render such restrictions valid and enforceable.

10.05 *Buy Out.* Commencing upon the date that a Member ceases to be a Member (for any reason whatsoever) and until the end of the Restrictive Period, such Member will have the option to pay the Company the amount of $_____ (the "*Buy Out Amount*") to buy out such Member's covenant not to compete with the Company contained in this Article 10. Each Member hereby expressly agrees that the Buy Out Amount is reasonable under the circumstances and expressly waives the right to have the Buy Out Amount determined by an arbitrator.

10.06 *Remedies for Covenant not to Compete, Solicit.* Each Member acknowledges and agrees that such Member's covenants set forth in this Article 10 are necessarily of a special, unique, and extraordinary nature and that the loss arising from a breach thereof cannot reasonably and adequately be compensated by money damages, as such breach will cause the Company to suffer irreparable harm. Accordingly, upon such Member's failure to comply with the terms and conditions of this Article 10 at any time, the Company or any of its successors or assigns shall be entitled to injunctive or other extraordinary relief, such injunctive or other extraordinary relief to be cumulative to, but not in limitation of, any other remedies that may be available, including without limitation, expulsion as a Member of the Company pursuant to Section 2.15 of this Agreement. Each Member's obligations set forth in this Article 10 shall survive the termination of such Member's membership interest in the Company (for any reason whatsoever).

## Article 11
## General Provisions

11.01. *Offset.* Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

11.02. *Notices.* All notices, requests, or consents under this Agreement shall be (a) in writing, (b) delivered to the recipient in person, by courier or mail or by facsimile, telegram, telex, cablegram, or similar transmission, (c) if to a Member, delivered to such Member at the applicable address on **Exhibit A** or such other address as that Member may specify by notice to the other Members, (d) if to the Managers or the Company, delivered to the Managers at the following address: if an initial manager in the Certificate, to the address provided for such Manager in the Certificate, otherwise to the address of the Company's principal place of business, and (e) effective only upon actual receipt by such Person. Whenever any notice is required to be given by applicable law, the Certificate, or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

11.03. *Entire Agreement; Supersedure.* This Agreement constitutes the entire agreement of the Members relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

11.04. *Effect of Waiver or Consent.* A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company.

11.05. *Amendments of Certificate and Agreement.* The Certificate and this Agreement may be amended or restated only with the written approval of Members entitled to vote owning seventy five percent (75%) or more of the Voting Sharing Ratios.

11.06. *Binding Effect.* Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

11.07. *Governing Law; Severability.* THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS (EXCLUDING ITS CONFLICT-OF-LAWS RULES). If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by applicable law.

11.08. *Construction.* Unless the context requires otherwise: (a) the gender (or lack of gender) of all words used in this Agreement includes the masculine, feminine, and neuter; (b) single nouns and pronouns include the plural and vice versa; (c) the word "including" means "including, without limitation"; (d) references to Article(s) and Section(s) refer to Article(s) and Section(s) of this Agreement; and (e) references to Exhibits are to the Exhibits attached to this Agreement, each of which is made a part hereof for all purposes.

11.09. *Further Assurances.* In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

11.10. *Counterparts.* This Agreement may be executed in any number of counterparts, all of which shall constitute the same instrument.

* * * * *

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE IMMEDIATELY FOLLOWS]

014596-001_20051-3

134

IN WITNESS WHEREOF, the Members have executed this Agreement as of the date first set forth above.

MEMBERS:

_____
Alan E. Bentz, M.D.

_____
Woodrow V. Dolino, M.D.

_____
Lavon Vartanian, M.D.

_____
Roba T. Antenah, M.D.

_____
George M. Davis, M.D.

24

## EXHIBIT A

### Initial Members (Founding Members)

**Alan E. Bentz, M.D.**

Address: P. O. Box 117
Houston, Texas 77056

Initial Capital Contribution: property having a value not less than $200.00
Sharing Ratio: 20.0%
Voting Sharing Ratio: 20.0%

**Woodrow V. Dolino, M.D.**

Address: 16407 Augusta Court
Spring, Texas 77379

Initial Capital Contribution: property having a value not less than $200.00
Sharing Ratio: 20.0%
Voting Sharing Ratio: 20.0%

**Lavon Vartanian, M.D.**

Address: 9403 Swansea Bay Drive
Spring, Texas 77379

Initial Capital Contribution: property having a value not less than $200.00
Sharing Ratio: 20.0%
Voting Sharing Ratio: 20.0%

**Roba T. Antenah, M.D.**

Address: 223 Westheimer Road
Houston, Texas 77006

Initial Capital Contribution: property having a value not less than $200.00
Sharing Ratio: 20.0%
Voting Sharing Ratio: 20.0%

**George M. Davis, M.D.**

Address: 27 Pebble Cove Drive
The Woodlands, Texas 77381

Initial Capital Contribution: property having a value not less than $200.00
Sharing Ratio: 20.0%
Voting Sharing Ratio: 20.0%

# APPENDIX 2

# American Arbitration Association

Alan Bentz, M.D. v. George M. Davis, M.D., Woodrow V. Dolino, M.D., Anteneh T. Roba, M.D., Levon Vartanian, M.D., Houston Northwest Emergency Specialists, P.L.L.C., Northwest Houston Emergency Specialists Group, P.L.L.C., ESG MD, P.L.L.C., and ESG MLP, L.L.C.

## Case # 70 193 Y 000608 12

Pursuant to the Commercial Arbitration Rules of the American Arbitration Association (AAA) and the terms of contracts between the parties, an evidentiary hearing was held at the offices of Fulbright and Jaworski, L.L.P., 1301 McKinney, Suite 5100, Houston Texas on August 19-22 and August 29, 2014, before Arbitrator Robert E. Wood. Appearing at the hearing were Andrew Price and Rachel Roosth for Claimant; Adam Looney for Respondents HNESG, NHES, ESG MD, and ESG MLP; and Matthew Mussalli and Shannon Brown for the Individual Respondents. The parties had a full opportunity to present evidence by testimony and documents, certain stipulations were entered by the parties, and counsel for each party ably argued their positions. Post-hearing submissions were received on September 19, 2014 and September 29, 2014 and the hearing was, at that time declared closed.

## Preliminary

This case involves the breakup of a group of doctors operating through various professional limited liability companies and a limited liability company to service the Emergency Medicine Department of Houston Northwest Medical Center.

The entities involved in this matter are Houston Northwest Emergency Specialists, P.L.L.C. ("HNES"), Northwest Houston Emergency Specialists Group, P.L.L.C. ("NHESG"), ESG MD, P.L.L.C. ("ESG MD"), and ESG MLP, L.L.C. ("ESG MLP") (collectively "the Entity Respondents"). All were owned in equal shares by the individuals detailed below except HNES which was wholly owned by NHESG. The terms of the Company Agreements of NHESG, ESG MD and ESG MLP are identical except for the names of the entities. The entities were operated in concert, were transparent as to taxes - all income flowing to the individual owners - and were referred to as the "Group."

The individuals involved include Alan Bentz, M.D. ("Claimant"), George M. Davis, M.D., Woodrow V. Dolino, M.D., Anteneh T. Roba, M.D., and Levon Vartanian, M.D. (each a Respondent and collectively the "Individual Respondents.")

By Article 9 of the relevant company Agreements, the Commercial Arbitration Rules of the American Arbitration Association and the law of the State of Texas, I am authorized to decide the arbitrability of and to resolve any dispute relating to the Agreements.

1488

## Expulsion and Option to Purchase

Limited liability companies, including professional limited liability companies, are curiously hybrid business entities. They are essentially incorporated partnerships. The statutory scheme provides corporate shareholder-like limitations on the liability of the owners (Members) and permits operation and governance with flexibility similar to a partnership, including the right to design such governance and operation by agreement even where it contradicts the statutory scheme (with some non-waivable statutory provisions). Moreover the federal income tax allows these entities to receive partnership tax treatment, i.e. no tax at the entity level.

The Texas Business Organization Code provides that a member of a limited liability company may not be expelled. TBOC §101.107. The relevant Company Agreements of the Entity Respondents ( "Agreements"), as they were permitted to do, actually permitted expulsion of a Member. Claimant and all Respondents, both entity and individual were bound by the Agreements with respect to the manner in which they dealt with expulsion. On September 19, 2011, the Individual Respondents, acting as the Executive Committee executed written consents expelling Claimant from NHESG, ESG MD and ESG MLP, effective September 30, 2011. The action was unanimous and cited as Cause "gross negligence or willful misconduct" as specified in Section 2.15 of the Agreements. Claimant argued that the only cited incidents did not rise to the level of "gross negligence or willful misconduct." Respondents disagreed and also argued that the Agreements gave the Executive Committee absolute discretion to decide. Despite the personal enmity and unseemly conduct of some of the doctors, I do not find that the Individual Respondents failed to follow the Agreements' provision for expulsion.

Following the expulsion, Respondents NHESG, ESG MD and ESG MLP exercised their respective options to purchase Dr. Bentz's Membership Interest as provided in Section 2.05 of the respective Agreements. However, to this date the payment required under Section 2.08 has not been made and no conveyance or closing has taken place. All Parties have acknowledged and I hereby find that the appropriate Fair Market Value of Dr. Bentz's Membership Interests is $526,796. The Agreements provide that the purchase price be paid within 210 days of the expulsion (Sections 2.05 and 2.08). In this case that would have been April 27, 2012 but for a tolling provision in Section 2.09 (b). Consequently the deadline for closing and payment was August 2, 2014. Failure to do so is a breach of the Agreement. Because of their inability to agree on a price, the Parties were forced to utilize the unwieldy valuation provisions of the Agreement. The option price or Fair Market Value was not determined until January 3, 2014. Unwieldy, cumbersome, illogical, or unfair, those were the contractual terms the Members accepted when they executed the Agreements. Thus I AWARD that Claimant shall have and recover from NHESG, ESG MLP and ESG MD the sum of $526,796 plus prejudgment interest at the statutory rate of five percent (5%), in the amount of $5268.

## Pro Rata Share of Distributions

If a Texas limited liability company chooses to alter, in its company agreement, the statutory rule that a Member may not be expelled, it must make very clear all of the consequences of expulsion. In construing such an agreement no rights or consequences that are not specifically provided for should be assumed. The Parties here all elected when they created and signed the Agreements that a Member could be expelled. However the Agreements are seriously deficient in specifying the consequences of expulsion. This is especially true in the case of a Founding Member who is an owner of the company and entitled to share distributions of profits. The Agreements do *not* say that a Member's Interest is terminated, forfeited or lost upon expulsion. Or that he shall, from that point, cease to be a Member and his Sharing Ratio be reduced to zero. Instead Section 2.05 of the Agreements demonstrates that an expelled Member retains his Membership Interest. The Company and the other Members have an option to purchase all of the Membership Interest owned by the expelled Member. What happens if they decline to exercise that option? The existence of the option itself recognizes that the Membership Interest survives expulsion. The option provides the Company and the other Members a mechanism for acquiring the expelled Member's Membership Interest. If the Membership Interest and its right to receive distribution of profits simply went away upon expulsion why would the Company or Members *ever* exercise their option? If the option mechanism did not exist, the Membership Interest, by statute a property interest, would continue until it was disposed of in accordance with the terms of the Agreements.

The Agreements further provide that no disposition of a Membership Interest shall be effective until all provisions of the Agreements have been satisfied and that a Membership Interest "elected to be purchased... shall be paid for at a closing [accompanied] by instruments of conveyance and assignment." Both of these provisions apply to the disposition by exercising the right to purchase an expelled Member's Membership Interest.

Common sense, logic and a careful reading of the Agreements compel that, until paid for his Interest, a Member, even an expelled Member, is entitled to his share of any distributions made by the Company. Because of the structure and the tax treatment of the Companies, the Individual Respondents were the recipients and the only financial beneficiaries of the failure to provide distributions to their fellow (although expelled) Member, Dr. Bentz. Therefore, whether by self-interested management, conversion, or to prevent the unjust enrichment of money had and received, Claimant shall have and recover from each Individual Respondent the sum of $228,445.50 plus pre-judgment interest in the amount of $20,764.50 for a total of $249,210. These awards are not joint and several, but are individual.

### Declaratory Judgment

The undertakings and activities of Respondents in expelling Claimant did not constitute a breach of the Agreements. However, as he was never paid for his Membership Interest, Claimant remained a Member of NHESG, ESG MD and ESG MLP until the entry of this AWARD, by which his Membership Interest is terminated and extinguished.

### Costs, Expenses and Attorney Fees

Section 9.03 provides that the party who prevails or substantially prevails in a proceeding under Article 9 "shall be entitled to recover...all costs, expenses and reasonable attorney fees incurred in...the proceeding." According to the pleadings this matter involves one claimant, eight respondents and 16 counts, constituting 67 separate claims. In addition it involved and includes another inextricably interrelated Article 9 proceeding under Section 9.01 of the Agreements to determine the fair market value of Claimant's Membership Interest. Respondents prevailed in the Section 9.01 proceeding. Moreover, HNES prevailed on all claims against it and is entitled to recover its costs, expenses and reasonable attorney fees. While several claims were not pursued and several denied, it is fair to say that Claimant substantially prevailed in his claims and is entitled to recover his costs, expenses and reasonable attorney fees.

Since each party is a prevailing party, I hereby rule and AWARD that all fees and expenses paid or payable to AAA for this arbitration be borne by the party paying or having paid them.

I hereby AWARD that Claimant have and recover the sum of $614,488.18 as recovery for costs, expenses and reasonable attorney fees. This portion of the award is against NHESG, ESG MD, ESG MLP, George M. Davis, Woodrow V. Dolino, Anteneh T. Roba and Levon Vartanian, jointly and severally.

Respondent HNES is also a prevailing party. I hereby AWARD that HNES have and recover from Claimant, the amount of $50,824.91 for its costs, expenses and reasonable attorney fees. If all parties agree, in writing, this sum can be credited against the attorney fee/cost award in favor of Claimant.

## Other Counts, Causes of Action and Prayers for Relief

I have considered each and every count, cause of action, claim, theory, measure of damages and prayer brought by each Party. I have entertained testimony, examined exhibits, stipulations, deposition excerpts and post-hearing submissions. I have read carefully and construed the relevant agreements. I have utilized and applied Texas law as I understand it. As a result, any relief not expressly granted in the following AWARD is denied.

(Remainder of this page intentionally left blank.
FINAL AWARD follows)

1491

# FINAL AWARD

I, the undersigned ARBITRATOR, having been designated in accordance with the Arbitration Agreement entered into by the above-named Parties, and having been duly sworn and having read the pleadings, heard the testimony, reviewed the relevant documents, listened to argument of counsel, read and considered the briefs and the post-hearing submissions, after full consideration of the record upon due deliberation, construing the contracts and applying Texas law, do hereby ORDER and AWARD that

Claimant shall have and recover from Respondents as follows:

1.  From NHESG, ESG MLP and ESG MD jointly and severally in the amount of $532,064.
2.  From George M. Davis in the amount of $249,210.
3.  From Woodrow V. Dolino in the amount of $249,210.
4.  From Anteneh T. Roba in the amount of $249,210.
5.  From Levon Vartanian in the amount of $249,210.

Additionally and separate from the above, Claimant shall have and recover:

6.  From NHESG, ESG MLP and ESG MD, George M. Davis, Woodrow V. Dolino, Anteneh T. Roba and Levon Vartanian, jointly and severally the amount of $614,488.18 as costs, expenses and attorney fees under Section 9.03 of the Agreements.

Respondent HNES shall have and recover from Alan Bentz the sum of $50,824.91 as costs, expenses and attorney fees.

The Administrative fees and expenses of the AAA totaling $15,700.00 are to be borne as incurred. The Compensation and expenses of Arbitrators totaling $31,975.93 are to be borne as incurred. Any remainder in existing deposits after payment of all fees and expenses will be refunded to the Parties pro rata.

This AWARD shall constitute full resolution of all claims, legal or equitable, that were or could have been brought in this matter. Any claim or prayer for relief not expressly granted is hereby denied.

Dated: October 15, 2014

_Robert E Wood_
Arbitrator's Signature

# APPENDIX 3

CAUSE NO. 2012-44569

P2
8a
nca

| | | |
|---|---|---|
| ALAN BENTZ, M.D., <br> Applicant, | § <br> § <br> § | IN THE DISTRICT COURT OF |
| v. | § <br> § | HARRIS COUNTY, TEXAS |
| GEORGE DAVIS, M.D., et al., <br> Respondents. | § <br> § <br> § | 190th JUDICIAL DISTRICT |

## FINAL JUDGMENT

On November Dec. 1, 2014, the Court heard Applicant Alan Bentz, M.D.'s ("Dr. Bentz") Application to Confirm an Arbitration Award (the "Application"). The Respondents to said Application are George M. Davis, M.D. ("Dr. Davis"), Woodrow V. Dolino, M.D. ("Dr. Dolino"), Anteneh T. Roba, M.D. ("Dr. Roba"), Levon Vartanian, M.D. ("Dr. Vartanian"), Houston Northwest Emergency Specialists, PLLC ("HNES"), Northwest Houston Emergency Specialists Group, P.L.L.C. ("NHESG"), ESG MD, P.L.L.C. ("ESG MD"), and ESG MLP, L.L.C. ("ESG MLP"), and attorneys for all Respondents appeared. After considering the Application, all additional briefing filed by the Parties, the Court's file, and the Parties' arguments, the Court signed an order confirming the arbitration award and calling for entry of a final judgment in conformity with the award. The Court accordingly enters this Judgment in conformity with the arbitration award and the order confirming it.

IT IS THEREFORE DECREED by the Court that it has jurisdiction over Dr. Bentz and the Respondents, who collectively constitute all Parties in this proceeding; and

IT IS ORDERED that Dr. Bentz shall have and recover from the Respondents as follows:

- From NHESG, ESG MLP, and ESG MD, jointly and severally, in the amount of $532,064

- From Dr. Davis in the amount of $249,210

- From Dr. Dolino in the amount of $249,210

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

- From Dr. Roba in the amount of $249,210

- From Dr. Vartanian in the amount of $249,210

IT IS ADDITIONALLY AND SEPARATELY ORDERED that Dr. Bentz shall have and recover from NHESG, ESG MLP, ESG MD, Dr. Davis, Dr. Dolino, Dr. Roba, and Dr. Vartanian, jointly and severally, the sum of $614,488.18.

IT IS ADDITIONALLY ORDERED that HNES shall have and recover from Dr. Bentz the sum of $50,824.91.

Execution shall issue for this Judgment. Dr. Bentz is allowed those writs and processes as may be necessary in the enforcement and collection of this Judgment. Additionally, this Judgment disposes of all claims by all parties, and it is a final and appealable judgment. Any claim or prayer for relief not expressly granted is hereby denied.

Signed this 9 day of Dec , 2014.

THE HONORABLE JUDGE KERRIGAN

- 2 -

1795

# APPENDIX 4

CAUSE NO. 2012-44569

P1
ejudx

| | | |
|---|---|---|
| ALAN BENTZ, M.D.,<br>Applicant, | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, TEXAS |
| | § | |
| GEORGE DAVIS, M.D., et al.,<br>Respondents. | § | 190th JUDICIAL DISTRICT |

## ORDER CONFIRMING AN ARBITRATION AWARD

On ~~November~~ Dec 1, 2014, the Court heard Applicant Alan Bentz, M.D.'s ("Dr. Bentz") Application to Confirm an Arbitration Award (the "Application"). After considering the Application, all additional briefing filed by the Parties, the Court's file, and the Parties' arguments, the Court has determined that Dr. Bentz's Application should be and is hereby GRANTED IN ITS ENTIRETY.

IT IS THEREFORE ORDERED that the Award dated October 15, 2014, which is attached hereto and which was issued by Arbitrator Robert E. Wood in the arbitration proceeding between Dr. Bentz and Respondents George M. Davis, M.D., Woodrow V. Dolino, M.D., Anteneh T. Roba, M.D., Levon Vartanian, M.D., Houston Northwest Emergency Specialists, PLLC, Northwest Houston Emergency Specialists Group, P.L.L.C., ESG MD, P.L.L.C., and ESG MLP, L.L.C., American Arbitration Association Case No. 70-193-Y-000608-12 (the "Award"), is hereby CONFIRMED.

IT IS FURTHER ORDERED that a final judgment shall be signed and entered in conformity with the Award.

Signed this 9 day of Dec, 2014.

THE HONORABLE JUDGE KERRIGAN

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1796

# APPENDIX 5

12/1/2014 10 45 38 AM
Chris Daniel - District Clerk Harris County
Envelope No 3324789
By CAROL WILLIAMS
Filed 12/1/2014 10 45 38 AM

CAUSE NO. 2012-44569

| | | |
|---|---|---|
| ALAN BENTZ, M.D., Applicant, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| GEORGE DAVIS, M.D., et al., Respondents. | § § § | 190th JUDICIAL DISTRICT |

**ORDER DENYING APPLICATION FOR PARTIAL VACATUR OR MODIFICATION OF ARBITRATION AWARD**

On this _1_ day of ___Dec___, 2014, the Court heard the Entity Respondents' Application for Partial Vacatur or Modification of Arbitration Award (the "Application").[1] After considering the Entity Respondents' Application, all additional briefing filed by the parties, the Court's file, and the parties' arguments, the Court has determined that the Entities' Application should be and hereby is DENIED.

Signed this _9_ day of ___Dec___, 2014.

THE HONORABLE JUDGE KERRIGAN

---

[1] The "Entity Respondents" refers to Northwest Houston Emergency Specialists, P L L C., Houston Northwest Emergency Specialists Group, PLLC, ESG MD, P.L.L.C., and ESG MLP, L.L.C, collectively.

**RECORDER'S MEMORANDUM**
This Instrument is of poor quality
at the time of imaging

1797

# APPENDIX 6

12/1/2014 10 45 38 AM
Chris Daniel - District Clerk Harris County
Envelope No. 3324789
By CAROL WILLIAMS
Filed 12/1/2014 10 45 38 AM

CAUSE NO. 2012-44569

| | | |
|---|---|---|
| ALAN BENTZ, M.D.,<br>Applicant, | § § § | IN THE DISTRICT COURT OF |
| v. | § § | HARRIS COUNTY, TEXAS |
| GEORGE DAVIS, M.D., et al.,<br>Respondents. | § § § | 190th JUDICIAL DISTRICT |

*PI*
*SPJUY*
*modiy*

## ORDER DENYING INDIVIDUALLY NAMED RESPONDENTS' MOTION TO PARTIALLY VACATE OR VACATE ARBITRATION AWARD OR IN THE ALTERNATIVE, MOTION TO MODIFY AWARD

On this 1 day of DeC , 2014, the Court heard the Individually Named Respondents' Motion to Partially Vacate or Vacate Arbitration Award or in the Alternative, Motion to Modify Award.[1] After considering the motion, all additional briefing filed by the parties, the Court's file, and the parties' arguments, the Court has determined that the Individually Named Respondents' Motion to Partially Vacate or Vacate Arbitration Award or in the Alternative, Motion to Modify Award should be and hereby is DENIED.

Signed this 9 day of DeC , 2014.

THE HONORABLE JUDGE KERRIGAN

---

[1] "Individual Named Respondents" refers to George Davis, M D , Levon Vartanian, M.D., Anteneh Roba, M D , and Woodrow Dolino, M.D., collectively.

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging

1798

# APPENDIX 7

> Vernon's Texas Statutes and Codes Annotated
>   Business Organizations Code (Refs & Annos)
>     Title 3. Limited Liability Companies (Refs & Annos)
>       Chapter 101. Limited Liability Companies (Refs & Annos)
>         Subchapter C. Membership

V.T.C.A., Business Organizations Code § 101.106

§ 101.106. Nature of Membership Interest

Effective: September 1, 2011
Currentness

(a) A membership interest in a limited liability company is personal property.

(a-1) A membership interest may be community property under applicable law.

(a-2) A member's right to participate in the management and conduct of the business of the limited liability company is not community property.

(b) A member of a limited liability company or an assignee of a membership interest in a limited liability company does not have an interest in any specific property of the company.

(c) Sections 9.406 and 9.408, Business & Commerce Code, do not apply to a membership interest in a limited liability company, including the rights, powers, and interests arising under the company's certificate of formation or company agreement or under this code. To the extent of any conflict between this subsection and Section 9.406 or 9.408, Business & Commerce Code, this subsection controls. It is the express intent of this subsection to permit the enforcement, as a contract among the members of a limited liability company, of any provision of a company agreement that would otherwise be ineffective under Section 9.406 or 9.408, Business & Commerce Code.

**Credits**
Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006. Amended by Acts 2009, 81st Leg., ch. 84, § 39, eff. Sept. 1, 2009; Acts 2011, 82nd Leg., ch. 139 (S.B. 748), § 35, eff. Sept. 1, 2011.

Notes of Decisions (6)

V. T. C. A., Business Organizations Code § 101.106, TX BUS ORG § 101.106
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

# APPENDIX 8

Vernon's Texas Statutes and Codes Annotated
Civil Practice and Remedies Code (Refs & Annos)
Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
Chapter 171. General Arbitration (Refs & Annos)
Subchapter D. Court Proceedings (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.087

§ 171.087. Confirmation of Award

Currentness

Unless grounds are offered for vacating, modifying, or correcting an award under Section 171.088 or 171.091, the court, on application of a party, shall confirm the award.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (27)

V. T. C. A., Civil Practice & Remedies Code § 171.087, TX CIV PRAC & REM § 171.087
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 9

> Vernon's Texas Statutes and Codes Annotated
>   Civil Practice and Remedies Code (Refs & Annos)
>     Title 7. Alternate Methods of Dispute Resolution (Refs & Annos)
>       Chapter 171. General Arbitration (Refs & Annos)
>         Subchapter D. Court Proceedings (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 171.090

§ 171.090. Type of Relief Not Factor

Currentness

The fact that the relief granted by the arbitrators could not or would not be granted by a court of law or equity is not a ground for vacating or refusing to confirm the award.

**Credits**
Added by Acts 1997, 75th Leg., ch. 165, § 5.01, eff. Sept. 1, 1997.

Notes of Decisions (2)

V. T. C. A., Civil Practice & Remedies Code § 171.090, TX CIV PRAC & REM § 171.090
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 10

> United States Code Annotated
>   Title 9. Arbitration (Refs & Annos)
>     Chapter 1. General Provisions (Refs & Annos)

9 U.S.C.A. § 9

§ 9. Award of arbitrators; confirmation; jurisdiction; procedure

Currentness

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresident, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

**CREDIT(S)**
  (July 30, 1947, c. 392, 61 Stat. 672.)

Notes of Decisions (439)

9 U.S.C.A. § 9, 9 USCA § 9
Current through P.L. 114-25 (excluding P.L. 114-18) approved 6-15-2015

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX 11

CASE NUMBER 70-193-000608-12

| | | |
|---|---|---|
| ALAN BENTZ, M.D., | § | BEFORE THE AMERICAN |
| | § | ARBITRATION ASSOCIATION |
| Claimant, | § | |
| | § | |
| v. | § | |
| | § | |
| GEORGE M. DAVIS, M.D., WOODROW | § | |
| V. DOLINO, M.D., ANTENEH T. ROBA, | § | |
| M.D., LEVON VARTANIAN, M.D., | § | |
| HOUSTON NORTHWEST EMERGENCY | § | |
| SPECIALISTS PLLC, NORTHWEST | § | |
| HOUSTON EMERGENCY SPECIALISTS | § | |
| GROUP, P.L.L.C., ESG MD, P.L.L.C., and | § | |
| ESG MLP, L.L.C., | § | |
| | § | |
| Respondents. | § | MR. ROBERT WOOD, ARBITRATOR |

## CLAIMANT DR. ALAN BENTZ'S PREHEARING BRIEF

FULBRIGHT & JAWORSKI L.L.P.
Andrew Price
State Bar No.: 24002791
Rachel Roosth
State Bar. No.: 24074322
Fulbright Tower
1301 McKinney, Suite 5100
Houston, Texas 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

"unjustifiable and likely to cause serious harm." It is difficult to see how Dr. Bentz's offer could meet that standard when Mr. Nguyen did not have authority to change the schedule without the permission of other doctors, and when Mr. Nguyen often received bonuses from the Entities for facilitating schedule changes.

Because Dr. Bentz was not expelled for proper reasons, Dr. Bentz's expulsion violated the Company Agreements. NHESG, ESG MD, ESG MLP, and the Individual Respondents are bound to the Company Agreements. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) (signatories to valid contracts are bound by those contracts); Tex. Bus. Org. Code § 101.052(a)(1)(". . . the company agreement of a limited liability company governs . . . the relations among members, managers . . ., and the company itself."); *see also Seven Hills Commercial, LLC v. Mirabal Custom Homes, Inc.*, No. 05-13-01306-CV, 2014 WL 3867837 at *10 (Tex. App.—Dallas Aug. 7, 2014, no pet. h.) (LLCs are bound by their company agreements). The respective Entities should be required to purchase Dr. Bentz's interest, and they are liable for the damages caused by their breaches, including for payment of the damages which are set forth below in Sections III.C, III.D, III.E, and III.F. *See In re White*, 429 B.R. at 211, 216–19 (holding that the terminated employee was entitled to post-termination distributions *and* either a buyout per the terms of the shareholders' agreement or an injunction requiring, among other things, that the company pay the terminated employee his pro rata share of any future distributions).

C. **Even if the Respondents properly expelled Dr. Bentz, they have still breached the Company Agreements by failing to pay him Fair Market Value of his Membership Interest.**

Even if Respondents did properly expel Dr. Bentz (which they did not), they have breached the Company Agreements by failing to fulfill their post-expulsion procedural